**ST. LOUIS BANK FOR COOPERATIVES**

v.

**The UNITED STATES.**

**No. 410–75.**

United States Court of Claims.

June 18, 1980.

Arthur E. Bryan, Jr., Chicago, Ill., attorney of record, for plaintiff; Don S. Harnack, George W. Benson, and McDermott, Will & Emery, Chicago, Ill., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr. and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG and SMITH, Judges.

## OPINION

PER CURIAM:

This federal income tax refund case comes before the court on both parties' exceptions to the recommended decision of Trial Judge Harkins filed on August 8, 1979.

The plaintiff is a nonexempt cooperative corporation. The questions are whether three items of the plaintiff's income for 1972 and 1973 were patronage sourced income under section 1382(b) of the Internal

Revenue Code of 1954 and therefore deductible from the plaintiff's gross income. These items are: (1) interest received on demand deposits in Farm Credit Banks or on loans to brokerage firms; (2) interest received on federal bonds the plaintiff purchased to maintain liquidity; and (3) a gain of $386 upon the sale of an automobile used in the plaintiff's business. The trial judge held that items (1) and (2) were patronage sourced and deductible but that item (3) was not patronage sourced and therefore was not deductible.

Upon consideration of the briefs and after oral argument, we agree with the trial judge's conclusion with respect to the first two items and adopt, with modifications, his recommended opinion and findings as the basis for our decision on those issues. We disagree, however, with the trial judge on issue (3), and we conclude that the gain on the sale of the automobile also is patronage sourced. We therefore have substituted our own discussion for that of the trial judge in the portion of his opinion following the caption, "Sale of Automobile." *

## OPINION OF THE TRIAL JUDGE

HARKINS, Trial Judge: Plaintiff, the St. Louis Bank for Cooperatives, a nonexempt corporation operated on a cooperative basis, claims a refund of income taxes and assessed interest in the amount of $18,021.62 for the taxable year ended June 30, 1972, and $17,120.08 for the year ended June 30, 1973. Defendant has filed a counterclaim for additional income taxes and interest in the amount of $7,744.58 for the 1972 tax year and $13,247.36 for 1973.

At issue is whether the following items of income qualify for distribution as patronage dividends pursuant to section 1382(b) of the Internal Revenue Code of 1954, as amended:

(a) interest income from demand deposits in nonpatron farm credit system banks, or from short-term loans to several brokerage houses through repurchase agreements, received by plaintiff through its management of funds surplus to the daily needs of its patrons;

(b) interest income obtained from certain Federal bonds required to be held for liquidity purposes in support of its banking business; and

(c) a gain of $386 realized upon the sale of an automobile used as a pool car by plaintiff's officers and staff.

The following analysis shows that these three items qualify as section 1382(b) patronage sourced income.[1]

As a corporation that operates on a cooperative basis, plaintiff is subject to the provisions of Subchapter T of the Internal Revenue Code of 1954, as amended.[2]

Subchapter T was added to the Internal Revenue Code in 1962 to clarify the tax status of patronage dividends paid by various types of organizations that operate on a cooperative basis. Prior to the 1962 amendments, farmers' marketing and purchasing cooperative organizations had enjoyed longstanding exemptions from Federal income taxation. Until 1951, these exempt farmers' cooperatives (about one-half the total cooperatives in the United States) were not required to file income tax returns; non-

---

* With the one exception noted below, we have adopted the trial judge's findings of fact. We have not printed them, however, because, to the extent necessary to the decision, they are incorporated in the opinion.

Finding 89, however, is changed to read as follows:

The gain realized by plaintiff from the sale in fiscal year 1972 of an automobile used in its business constitutes earnings from "business done with or for patrons" as used in 26 U.S.C. § 1388(a).

1. In addition, the parties identified and briefed two other issues: whether any interest expense

is allocable to the interest income obtained by plaintiff in issue (b), and whether plaintiff is entitled to offset nonpatronage sourced losses against undistributed patronage sourced income to determine plaintiff's taxable income. The disposition of issues (a) and (b) makes decision on these additional issues unnecessary, and no decision is made on those issues.

2. Pub.L.No. 87–834, § 17(a), 76 Stat. 1045 (codified at 26 U.S.C. §§ 1381–88 (1976)). Unless otherwise specified all code references are to the Internal Revenue Code of 1954, as amended.

exempt organizations that operated on a cooperative basis, however, historically had been required to file. Commencing 1951, exempt farmers' cooperatives were required to file ordinary corporate income tax returns. Both exempt and nonexempt cooperatives, when computing taxable income, continued to be allowed to deduct the dollar value of patronage dividends from gross income. This deduction had been permitted for both exempt and nonexempt cooperatives as an administrative practice by the Internal Revenue Service as early as 1918.[3] Exempt farmers' cooperatives, in 1951, were granted additional special deductions from gross income for amounts paid as dividends on capital stock and amounts allocated to patrons which were paid from funds derived from nonpatronage business.

The Internal Revenue Codes of 1939 (as amended) and of 1954 addressed only a defined group of exempt farmers' cooperatives, which were permitted all of the above deductions from gross income.[4] Subchapter T permits all cooperatives covered to deduct from gross income amounts paid currently as patronage dividends; and retains the above special deductions as to exempt farmers' cooperatives.

As a nonexempt cooperative, plaintiff is authorized to deduct from its gross income amounts that were paid "as patronage dividends," which amounts are treated as items of gross income and as deductions therefrom.[5] A "patronage dividend" is defined as an amount "paid to a patron" on the basis of quantity or value "of business done with or for such patron." Subchapter T specifically excludes (a) any amount paid to a patron that is out of earnings other than from "business done with or for patrons" or (b) any amount that is from earnings from business done "with or for other patrons" to whom different amounts were paid on transactions substantially the same.[6] To determine plaintiff's income subject to tax, accordingly, its net earnings must be divided into two categories: net earnings from

---

3. T.D. 2737, 20 TREAS.DEC.INT.REV. (1918). The exclusion of patronage dividends for Federal income tax purposes was justified upon the theory they were either (1) rebates on purchases that represented a reduction in cost for goods purchased on the patrons' behalf, or (2) deferred payments on sales in the nature of additional consideration for goods the cooperative sold for the patron. *See generally, Farmers' Coop. Co. v. Birmingham*, 86 F.Supp. 201, 205–14 (D.C.Iowa, 1949).

4. Int.Rev.Code of 1939, ch. 1, § 101(12) (as amended, ch. 521, title III, §§ 314(a) and (b), 65 Stat. 490 (1951)); and Int.Rev.Code of 1954, §§ 521–22 (as amended and partially repealed, 76 Stat. 1045 (1962)).

5. 26 U.S.C. § 1382(b) (1976), in part, provides:
"(b) Patronage dividends and per-unit retain allocations
"In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—
"(1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d)) with respect to patronage occurring during such taxable year;
　　*　　*　　*　　*　　*　　*

"For purposes of this title, any amount not taken into account under the preceding sentence shall, in the case of an amount described in paragraph (1) or (2), be treated in the same manner as an item of gross income and as a deduction therefrom, and in the case of an amount described in paragraph (3) or (4), be treated as a deduction in arriving at gross income."

6. 26 U.S.C. § 1388(a) (1976) provides:
"(a) Patronage dividend
"For purposes of this subchapter, the term 'patronage dividend' means an amount paid to a patron by an organization to which part I of this subchapter applies—
"(1) on the basis of quantity or value of business done with or for such patron,
"(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and
"(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.
"Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions."

business done "with or for patrons" and earnings which are derived from sources other than patronage. Only earnings from business done with or for patrons may be excluded as patronage dividends.

Before the 1962 amendments to the Internal Revenue Code, patronage dividends were not specifically confined to amounts derived from business done "with or for" patrons. Nor was such a definition embodied in the Treasury regulations. The code, however, authorized exempt farmers' cooperatives specifically to deduct "amounts allocated to patrons with respect to income not derived from patronage."[7] Subchapter T continues this special deduction for farmers' cooperatives in 26 U.S.C. § 1382(c).

Regulations pursuant to Subchapter T were promulgated April 2, 1963.[8] With respect to the phrase "business done with or for" patrons, the regulations in essence restate the statute and do not elaborate on its content.[9] They, however, do amplify the statutory phrase "sources other than patronage" applicable to exempt farmers' cooperatives.

Patronage sourced income and nonpatronage sourced income are mutually exclusive classifications. Definition of the content of the phrase "patronage sourced income," ac-

cordingly, can be inferred from interpretations that have been given the phrase "sources other than patronage." Whether the challenged items were properly classified by plaintiff as income from business done with or for its member patrons depends upon their exclusion from the factual content of the phrase "sources other than patronage."

A particular item of income is patronage sourced when the transactions involved are "directly related to the marketing, purchasing, or service activities of the cooperative association." The description of nonpatronage sourced income in the IRS regulations has remained identical since first introduced in 1951.[10] The Subchapter T regulation, consistent with the provisions of section 1382(c), continues this description for income derived from sources other than patronage.[11]

■ The IRS description of nonpatronage sourced income is a longstanding interpretation and the statutory provisions to which the regulations pertain twice have been reenacted by Congress without material change.[12] The Treasury regulation in these circumstances is deemed to have Congressional approval. A court may accord

---

7. Int.Rev.Code of 1939, *supra* note 4, and Int. Rev.Code of 1954, § 522 (repealed 1962).

8. T.D. 6643, 1963-1 C.B. 148.

9. Treas.Reg. § 1.1388-1(a). The regulation does give content to "patron" as follows:

"(e) *Patron.* The term 'patron' includes any person with whom or for whom the cooperative association does business on a cooperative basis, whether a member or a nonmember of the cooperative association, and whether an individual, a trust, estate, partnership, company, corporation, or cooperative association." (Treas.Reg. § 1.1388-1(e)).

10. Regulations promulgated in 1951 under the Internal Revenue Code of 1939, as amended, defined income not derived from patronage as follows:

"§ 39.101(12)-3(d):

"There is allowable as a deduction from the *gross income of a cooperative association* operated in compliance with the requirements of § 101(12)(A) and § 39.101(12)-1 amounts allocated to patrons with respect to income not derived from patronage. . . . As used in

this paragraph 'income not derived from patronage' means incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association. For example, income derived from the lease of premises, from investment in securities, from the sale or exchange of capital assets, constitutes income not derived from patronage. Business done with the United States shall constitute income not derived from patronage."

11. Treas.Reg. § 1.1382-3(c)(2) provides:

"(2) *Definition.* As used in this paragraph, the term 'income derived from sources other than patronage' means incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association. For example, income derived from the lease of premises, from investment in securities, or from the sale or exchange of capital assets, constitutes income derived from sources other than patronage."

12. Int.Rev.Code of 1954, and Subchapter T in 1962.

great weight to a longstanding interpretation placed on a statute by the agency charged with its administration.[13]

### Plaintiff's Business

Plaintiff is part of the Federal farm credit system, which is under the supervision of the Farm Credit Administration (FCA), an independent agency of the Executive Branch. The United States is divided into 12 farm credit districts, with 37 banks in the system: 12 Federal land banks, 12 Federal intermediate credit banks, 12 district banks for cooperatives, and the Central Bank for Cooperatives. Plaintiff is chartered by the Federal Government pursuant to the Farm Credit Act of 1933, and now operates pursuant to authority in the Farm Credit Act of 1971.[14]

From 1933 to 1968, banks for cooperatives were funded by Government capital and were tax exempt. Legislation in 1955 authorized retirement of Government capital to facilitate borrower participation in the management, control and ultimate ownership in the banks for cooperatives.[15] In June 1967, plaintiff retired all United States capital and, beginning with fiscal year 1968, plaintiff became subject to Federal income tax. Plaintiff continues to be regulated and supervised by the FCA; FCA examiners audit and examine plaintiff's operations at least once a year.[16]

Plaintiff is authorized to make loans to eligible farmers' cooperatives located in the St. Louis farm credit district, which consists of Illinois, Missouri and Arkansas. Plaintiff's members and owners are eligible farmers' cooperative borrowers, which contribute to the equity of plaintiff in proportion to business done with plaintiff. As a cooperative, plaintiff is obligated to distribute its annual net earnings to its member patrons as patronage dividends on a cooperative basis based upon the volume of business done by each member with plaintiff.

The Central Bank for Cooperatives is organized on a cooperative basis to serve as the central bank for banks for cooperatives. It does not lend money directly to farmers' cooperatives. Plaintiff and the other 11 district banks provide the equity for, and constitute all of the members and owners of, the Central Bank for Cooperatives.

The Central Bank for Cooperatives has two primary functions: (1) it purchases participations in the loans of district banks for cooperatives when such loans exceed FCA legal lending limits; and (2) its money desk serves as a clearing house for short-term loans within the farm credit system. When the Central Bank purchases a participation in one of plaintiff's loans, plaintiff is a borrower from the Central Bank and is required to pay interest to it. The 12 district banks for cooperatives receive patronage dividends from the Central Bank for Cooperatives, distributed on a cooperative basis based upon the volume of participation done by each district bank with the Central Bank for Cooperatives.

Plaintiff's sources of funds for loans to its borrowers include: equity capital raised by required purchases of override stock in connection with each loan made to an eligible cooperative borrower and by distributions of annual patronage dividends in class C stock or allocated surplus; sales of consolidated bonds; and, after 1975, sales of consolidated systemwide discount notes. Plaintiff also obtains additional loanable funds through short-term borrowings from the Central Bank for Cooperatives, from lines of credit with several commercial banks and from the other farm credit banks in its district.

Authority for the banks for cooperatives to issue consolidated debentures (changed to "consolidated bonds" in 1971) as a meth-

**13.** *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–1762, 40 L.Ed.2d 134 (1973); *Crane v. Commissioner*, 331 U.S. 1, 7–8, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1946).

**14.** Farm Credit Act of 1971, 85 Stat. 602; 12 U.S.C. §§ 2121–34 (1976).

**15.** Farm Credit Act of 1955, 69 Stat. 655.

**16.** Farm Credit Act of 1971, *supra* note 14.

od of raising loanable funds was not conferred until 1954, and the first sale occurred in 1955. Consolidated bonds are secured joint and several obligations of the 13 banks for cooperatives, have a 6-month maturity, are issued on a monthly basis, and are sold on the open market through a Fiscal Agent in New York City. During fiscal years 1972 and 1973, consolidated bonds were authorized to be issued ten times a year, once each month except in March and September. Consolidated systemwide discount notes are secured joint and several obligations of the 37 farm credit system banks, have a maturity ranging from 5 to 150 days, and are marketed on a weekly basis.

During fiscal years 1972 and 1973, plaintiff's primary source of funds for loans to its member borrowers was the issuance of consolidated bonds, and the Central Bank for Cooperatives was relied upon as the primary supplier of short-term borrowings.

Plaintiff's borrowing of funds from the Central Bank for Cooperatives on a demand basis, and its lending of surplus funds on a demand basis to the Central Bank, had no effect on plaintiff's equity position in the Central Bank. The Central Bank for Cooperatives, the Federal Intermediate Credit Bank of St. Louis, and the Federal Land Bank of St. Louis, are not members or owners of plaintiff and they do not receive patronage dividends from plaintiff.

For fiscal year 1972, plaintiff reported it had 272 borrowers, and total loans outstanding of $220,638,606. For fiscal year 1973, plaintiff reported it had 284 borrowers, and total loans outstanding of $325,-541,342. Plaintiff's total capital, surplus and reserves, was $33,175,956 on June 30, 1972, and $35,355,237 on June 30, 1973. During fiscal year 1972, plaintiff sold $292 million in consolidated bonds and retired $271 million in matured bonds. In 1973, sales of consolidated bonds were $333 million and retirements were $306 million.

*Surplus Funds*

In the normal course of its operations to provide banking services to its borrowers, plaintiff would determine on a daily basis whether it was in a deficit funds position or in a surplus funds position, after 12 o'clock noon, when it closed transactions with its borrowing cooperatives. Plaintiff was in a long position, and had surplus funds, when it had overestimated the needs of its borrowers and had available cash on hand not loaned out to cooperatives; it was in a short or deficit position when it had underestimated their needs.

Plaintiff's position varied considerably from day to day, and rarely was in balance. Variances frequently were in the millions of dollars. During fiscal years 1972 and 1973, plaintiff on the average was in a deficit position and had to borrow substantially more funds on a short-term basis than it placed out. Plaintiff's net daily deficit position averaged approximately $5 million in 1972 and $15 million in 1973.

The source of any surplus funds was plaintiff's most recent sale of consolidated bonds. Surplus funds were borrowed money that had been generated during the process of providing banking services to borrowing cooperatives.

Participation in a consolidated bond issue involved procedures that frustrated accurate planning or precise adjustment of available funds to borrowers' loan demands. Arrangements for each consolidated bonds issue involved coordination of the individual bank for cooperatives, the FCA, and the Fiscal Agent. Approximately 45 days in advance of the market date, each district bank for cooperatives began preparing its information and supporting data for the amount of its participation. Each bank was required to submit to the FCA a firm commitment for its desired participation along with relevant supporting data, from 3 to 4 weeks before each issue date. The FCA worked with the Fiscal Agent to coordinate the requests and to arrange the details of each issue. During fiscal years 1972 and 1973, an issue usually was priced a week after the date the banks were required to submit data to the FCA. The bonds then were offered to the public at that price for delivery several weeks later. On the date of delivery (the "issue date"), the proceeds of that issue were made available to the individual participating banks.

Supporting data submitted to the FCA on a participation in a bond issue set forth plaintiff's actual position as to loans outstanding and source of funds at the prior bond entry date, and plaintiff's projected position as of the forthcoming, and five succeeding bond entry dates. Beginning with the June 1973 issue, plaintiff was required to project its position for 12 succeeding months.

Participation in an issue required plaintiff to predict its loan demand for almost a 2-month period—the period until the next succeeding bond issue date when its position could be adjusted. During the two periods in fiscal years 1972 and 1973 when there was no market date in a month (March and September), plaintiff was required to make firm commitments for a period that extended over 75 days.

Planning a participation in a consolidated bond issue was complicated further by the volatility of loan demand and repayments. Loan demand from plaintiff's borrowers fluctuated by millions of dollars day to day. Unpredictable external factors that affect farm operations, size of harvests, and marketing of farm products had an influence on loan demand. Weather, commodity prices, transportation developments, marketing developments, and foreign demand had affected plaintiff's borrowers' loan requirements. Alternate sources of credit, such as the loan programs of the Commodity Credit Corporation, had a direct impact on plaintiff's loans to member cooperatives.

During fiscal years 1972 and 1973, to avoid having surplus funds, plaintiff attempted to set the level of its participation in each consolidated bond issue at a level that would permit it to meet or be slightly short of the needs of its borrowers. The limited number of bond entry dates and the volatility and unpredictability of loan demand, however, prevented realization of this objective, and it was not always possible for plaintiff to avoid having surplus funds on hand on any particular business day. Plaintiff never set its level of participation in a bond issue with the intention of obtaining funds that were surplus to the needs of its borrowers.

During fiscal years 1972 and 1973, when plaintiff found itself in a deficit position, the Central Bank for Cooperatives generally had available sufficient funds that plaintiff could borrow on a demand basis to cover advances to its borrowers. If funds were not available at the Central Bank, plaintiff would utilize lines of credit maintained with several commercial banks. If necessary, plaintiff borrowed funds on a demand basis from other farm credit banks in the district, the Federal Land Bank of St. Louis, and the Federal Intermediate Credit Bank of St. Louis.

During fiscal years 1972 and 1973, when plaintiff found it had funds available that were surplus to the needs of its borrowers, it normally loaned the funds on a demand basis to the Central Bank for Cooperatives, or, on several occasions, to other farm credit banks in its district, in compliance with FCA policy to encourage intersystem usage of surplus funds. On four occasions in fiscal year 1972, when it became apparent that neither eligible cooperative borrowers nor other farm credit system banks would have an immediate need for surplus funds, plaintiff used repurchase arrangements to loan the funds to brokerage houses that sold consolidated bonds. The repurchase agreements were designed to mature in conjunction with the next consolidated bond maturity date.

In fiscal years 1972 and 1973, there were six periods when plaintiff had surplus funds for longer than 1 day: (1) August 18 to October 20, 1971; (2) November 1, 1971, to January 3, 1972; (3) August 31 to October 2, 1972; (4) October 12 to October 16, 1972; (5) November 1 to December 11, 1972; and (6) May 16 to May 30, 1973. At trial plaintiff's treasurer explained the events that produced these periods. They were due variously to underestimates on the volume of pay downs by borrowers, major borrowers' use of CCC funds to repay loans made by plaintiff, erroneous projections that loan demand would not increase between a February bond issue and the next issue in April 1972, fluctuations in commodity prices

caused by Russian wheat purchases, and changes in CCC commodity loan programs. This testimony was a cogent explanation of the direct relationship of plaintiff's money management operations to the provision of banking services.

Plaintiff's surplus funds were derived from sales of consolidated bonds; accordingly, the interest cost was the effective interest rate of the most recent bond offering. The interest rate obtained by plaintiff on loans of surplus funds on a demand basis generally was lower than the effective interest rate for consolidated bonds with a 6-month maturity. Plaintiff's surplus funds cost it $18,615.74 during fiscal year 1972 and $4,270.20 during 1973.

Surplus funds on hand after the noon cutoff point could not be used to retire outstanding consolidated bonds, which were not subject to call, before the next bond maturity date. Surplus funds could not be used to make interim patronage dividends or retire capital stock in the hands of plaintiff's member patrons because the Act, FCA regulations, and plaintiff's charter and by-laws prohibited the use of borrowed funds for distribution to patrons or to redeem stock.

Surplus funds were loaned on terms that were materially different from the loans plaintiff made to member patrons. Surplus funds were loaned on a demand or short-term basis to assure availability in the event it was determined they were needed to cover advances to eligible borrowers. Variable interest rates did not apply to loans of surplus funds. Term loans, seasonal loans, and loans with variable interest provisions were made only to eligible farmers' cooperatives.

Defendant argues that plaintiff's treatment of surplus funds functionally is a separate activity from its borrowing to correct a deficit position. Borrowing of funds to correct a deficit position is admitted to be directly related to plaintiff's banking service for its member cooperatives; lending surplus funds to other farm credit system banks and to the brokerage houses, however, is seen as a separate operation only incidental to plaintiff's authorized banking service to its patrons. Defendant contends the term "money management" can be applied only to plaintiff's activities to correct a long position; activities to correct a short position are part of plaintiff's banking services and are not an aspect of "money management" according to defendant.

In defendant's analysis, plaintiff's loans to the Central Bank for Cooperatives, the Federal Land Bank of St. Louis, the Federal Intermediate Credit Bank of St. Louis, and to the brokerage houses were not business done "with" its patrons because they are not members or owners, they were not paid dividends, and business was not done with them on a cooperative basis. The loans of surplus funds were not business transactions "for" patrons, according to defendant, because they were incidental attempts to make profits that did not directly facilitate plaintiff's banking services. Defendant relies upon the line of cases that hold, where a cooperative's income is derived from business done with both members and nonmembers to whom dividends are not paid on a cooperative basis, income from the nonmembers is nonpatronage sourced.[17]

Defendant's analysis is too narrow. Plaintiff's loans of surplus funds cannot be viewed in isolation from plaintiff's overall business functions. Plaintiff found itself with surplus funds or in a deficit position on particular days as a result of a procedure that required it to make forward commitments for participations in bond issues based upon anticipated needs subject to wide variations. Management of both surplus funds and funds to cover a deficit position was an integral part of plaintiff's activities as a banking service cooperative. Plaintiff's business as a service cooperative was not to make loans to nonmembers; loans to the other farm credit system banks

---

17. *Pomeroy Coop. Grain Co. v. Commissioner*, 288 F.2d 326 (8th Cir. 1961); *Smith & Wiggins Gin, Inc. v. Commissioner*, 341 F.2d 341 (5th Cir. 1965); and *Iberia Sugar Coop. v. Commissioner*, 360 F.Supp. 967 (W.D.La.1972), *aff'd per curiam*, 480 F.2d 548 (5th Cir. 1973).

and to the brokerage houses differed fundamentally from the kind of service plaintiff gave to its patrons. Plaintiff's banking service was the provision of a ready source of funds for long-term or seasonal loans to its members. Nonmembers did not get this service; nonmembers were a source of funds temporarily short .or a means to reduce the cost of funds temporarily surplus. Loans made with surplus funds differed materially from the term or seasonal loans made to member patrons. Loans to member patrons were to provide financing for agricultural activities necessary to a farmers' cooperative. Nonmembers were not eligible for, and did not receive, term or seasonal loans from surplus funds. Nor did variable interest rates apply to loans of surplus funds.

The *Pomeroy* line of cases defendant cites does not fit the facts of this case. In each of those cases, the transactions between the cooperative and its patrons were the same as the transactions between the cooperative and the outsider that did not receive dividends.[18] Plaintiff provides a service to its member cooperatives that is dissimilar in character from the activities undertaken with nonmember borrowers.

There are three revenue rulings which provide guidance as to the types of transactions that satisfy the "directly related" test in Treasury Regulation § 1.1382–3(c)(2) as applied to patronage sourced income. Two of the factual situations involved in the revenue rulings were concerned with income from nonmembers which nonetheless qualified as patronage sourced. A fourth ruling, relied upon by defendant, also addresses the standard defined in Treasury Regulation § 1.1382–3(c)(2). It is inherently defective.

■ Revenue rulings are not binding precedent, but they can provide some guidance as to the types of transactions which are directly related to the business of the cooperative.[19] They "reflect the trend of official opinion" and the position of administrators experienced with application of the act.[20] A 1969 ruling [21] addressed the question where the taxpayer-cooperative borrowed money from a bank for cooperatives to finance acquisition of agricultural supplies for resale to members. Interest dividends from the bank were patronage sourced because the loan actually facilitated the cooperative's purchasing activities. The ruling states:

> The classification of an item of income as from either patronage or nonpatronage sources is dependent on the relationship of the activity generating the income to the marketing, purchasing, or service activities of the cooperative. If the income is produced by a transaction which actually facilitates the accomplishment of the cooperatives' marketing, purchasing, or service activities, the income is from patronage sources. However, if the transaction producing the income does not actually facilitate the accomplishment of these activities but merely enhances the overall profitability of the cooperative, being merely incidental to the association's cooperative operation, the income is from nonpatronage sources.

A 1974 ruling [22] involved a nonexempt cooperative for the manufacture and sale of plywood which loaned money to its chief supplier, a nonpatron, to finance equipment to be used in the supplier's business. Without the loan, the supplier would not have

**18.** *Id.* In *Pomeroy*, the grain elevator cooperative stored grain for its members and for the Government, Commodity Credit Corporation; in *Smith & Wiggins Gin*, the cooperative ginned and wrapped cotton, and processed marketed cotton seed from the cotton, for both members and their nonmember tenants; in *Iberia Sugar*, the cooperative refined and sold sugar owned by its patrons and by outsiders who were tenants of the patrons.

**19.** *Helvering v. New York Trust Co.*, 292 U.S. 455, 468, 54 S.Ct. 806, 810, 78 L.Ed. 1361 (1933).

**20.** *Brennan v. Great Am. Discount & Credit Co.*, 477 F.2d 292, 297 (5th Cir.), *cert. denied*, 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106 (1973).

**21.** Rev.Rul. 69–576, 1969–2 C.B. 166.

**22.** Rev.Rul. 74–160, 1974–1 C.B. 245.

been able to supply the cooperative. The ruling expressly reaffirms the 1969 principles and holds that although interest from the loan did not arise directly from a transaction with patrons, it was patronage sourced income because the transaction directly facilitated accomplishment of the cooperative's purchasing activities. A 1975 ruling [23] involved a Domestic International Sales Corporation (DISC), created by an exempt farmers' cooperative to sell in overseas markets fruits produced by its members. The DISC paid dividends to its parent based upon its selling commissions, which were held to be patronage sourced. The ruling states:

> The classification of an item of income as from either patronage or nonpatronage sources is dependent upon the relationship of the activity generating the income to the marketing, purchasing, or service activities of the cooperative. Thus, if the income is produced by a transaction directly connected with marketing patrons' products, the income is from patronage sources.

■ Persuasiveness of an administrative interpretation of a statute or rule depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements . . .." [24] Revenue Rulings 69–576, 74–160, and 75–228 are persuasive to indicate the scope of activities that are encompassed in the "directly related" test. A reasonable application of Treasury Regulation § 1.1382–3(c)(2) encompasses activities "facilitating" the accomplishment of the business activities of the cooperative, activities not "merely enhancing the overall profitability," and activities not "merely incidental to the cooperative association's overall operation."

Defendant relies upon a 1973 ruling [25] as authority that plaintiff's interest income from loans of surplus funds was nonpatronage sourced because the income was attributable to business with nonmembers who were not dealt with on a cooperative basis. This revenue ruling does not apply the "directly related" test. It specifically is concerned with two of the three issues involved in this case, was issued after the controversy herein arose, and it lacks a reasoned analysis. The ruling reiterates the language of the regulation, is conclusory in content, and of little persuasive value. There is no discussion of facts which delimit the role of surplus funds in the services provided by a bank for cooperatives. Its promulgation after the controversy at bar arose detracts from its persuasive force.[26] The IRS in the 1973 ruling adopted a view antagonistic to its previous construction of the statute and regulation, and out of step with the subsequent 1974 and 1975 rulings that applied the "directly related" test. In these circumstances, the 1973 ruling is entitled to no weight as an administrative determination.[27]

■ The "directly related" test can be satisfied when the transactions with nonmembers are different in nature from the cooperative's transactions with patrons. In *Linnton Plywood* [28] two nonprofit workers' cooperatives for the manufacture of plywood organized a glue manufacturer in which each owned 50 percent. Dividends paid by the glue manufacturer on a patronage basis to the organizers were patronage sourced because procurement of glue is essential for the manufacture of plywood, and the glue business was "reasonably related to the business done with or for its patrons."

Transactions with third parties that are reasonably related to the business which a

**23.** Rev.Rul. 75–228, 1975–1 C.B. 278.

**24.** *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Brennan v. Great Am. Discount & Credit Co.*, supra note 20, at 297.

**25.** Rev.Rul. 73–497, 1973–2 C.B. 18.

**26.** *Case & Co. v. Board of Trade*, 523 F.2d 355, 361 (7th Cir. 1975).

**27.** *Atchinson, Topeka & Santa Fe Ry. v. United States*, 209 F.Supp. 35, 42 (N.D.Ill.1962).

**28.** *Linnton Plywood Ass'n v. United States*, 410 F.Supp. 1100, 1108 (D.Or.1976).

cooperative conducts with its patrons, and which benefits the patrons other than incidentally through the generation of extra income, is business "with or for" patrons. Defendant does not dispute the *Linnton Plywood* decision on its facts, and defendant accepts the propriety of the "directly related" test where the facts accord. Defendant asserts, however, that plaintiff's money management activities with surplus funds were not directly related to its banking service for patrons. Defendant draws an analogy to a manufacturing corporation or a marketing or purchasing cooperative managing funds temporarily surplus by placing them in Treasury bills, commercial paper or certificates of deposit. The analogy is not apt. Plaintiff's money management activities are more than the mere investment of extra funds generated in functionally unrelated business activities. Plaintiff is a service cooperative, not a marketing or purchasing cooperative, and its function is to serve as a financial intermediary that transfers capital from buyers of consolidated bonds to its member patrons in the form of credit.

In its management of surplus funds, plaintiff secures interest income which results in lessening costs for the credit provided to its patrons. Plaintiff's demand loans of surplus funds to the other farm credit system banks and the brokerage houses directly reduced the cost of the dollars which already had been borrowed through the sale of consolidated bonds.

The transactions which generated interest income from the use of surplus funds are integrally intertwined with the process of borrowing money to supply capital to the cooperatives. The transactions would not occur but for the process whereby plaintiff secures funds to lend to its members. In these circumstances, income derived from management of surplus funds is directly related to plaintiff's services to its members and is patronage sourced.

*Liquidity*

During fiscal years 1972 and 1973, prior to January 2, 1973, the FCA required plaintiff, as far as practicable, to keep invested in cash or eligible investments an amount equal to between 20 and 25 percent of its capital stock. During this period, plaintiff met the FCA requirements by holding United States Treasury bonds in the amount of $1,545,000 and FNMA bonds or consolidated Federal land bank bonds in the amount of $500,000. The purpose of the FCA regulations was to assure banks for cooperatives maintained adequate liquidity to be able to provide a ready source of credit to farmers' cooperatives. Effective January 2, 1973, FCA regulations were changed to make it the responsibility of each bank to establish its liquidity needs, subject to FCA review. Plaintiff continued to follow, during the balance of fiscal year 1973, the minimum investment requirements previously set by the FCA.

Defendant contends that plaintiff's ownership of United States Treasury bonds, Federal National Mortgage Association bonds, and consolidated Federal land bank bonds are investments. Defendant relies upon Treasury Regulation § 1.1382–3(c)(2), which cites income from investments in securities as one specific example of incidental income not directly related to marketing, purchasing or service activities of a cooperative, and the determination in Revenue Ruling 73–497 that banks for cooperatives owned the Government securities as investments. To buttress this contention, defendant points to FCA regulations, plaintiff's articles of incorporation, income tax returns, and reports to its directors and stockholders, which refer repeatedly to the ownership of bonds held for liquidity purposes as "investments." Defendant also challenges plaintiff's contention that ownership of the bonds for liquidity purposes involved a net cost. In support, defendant cites the Federal tax maxim that a transaction is to be given its tax effect in accord with what actually occurred, not with what might have occurred.[29] Defendant points

---

**29.** *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148–49, 94 S.Ct. 2129, 2136–2137, 40 L.Ed.2d 717 (1974);

*Higgins v. Smith*, 308 U.S. 473, 477, 60 S.Ct. 355, 357, 84 L.Ed. 406 (1940).

out that the coupon interest rate on FNMA bonds was always substantially above the effective rate of plaintiff's outstanding consolidated bonds.

Plaintiff responds that the bonds were not held for investment purposes, and complains defendant confuses common usage of the word "investment" with its definition for tax purposes. How plaintiff referred to the bonds in its FCA reports, and its internal documents may indicate lack of artistry in record keeping, but it has little probative value as to whether the bonds were held as "investments" for purposes of Federal income tax. It is necessary to ascertain the purpose for which the bonds were held to determine whether they were in fact "investments" that produced income incidental to plaintiff's banking services for its patrons.

■ Plaintiff must maintain a level of liquidity that permits consolidated bonds to be marketed at a reasonable cost. Liquidity also assists plaintiff to borrow from secondary sources when a need for funds develops between consolidated bond issues, and provides plaintiff with some cushion in the event adverse economic conditions limit regular sources of loan funds.

Holding bonds for liquidity was not incidental to the provision of banking services, it was a prerequisite of plaintiff's doing business at all. The bonds were not held as investments, they were necessary to fulfill plaintiff's purpose as a bank for cooperatives.

The interest yield of the bonds held for liquidity was substantially below the rate of interest charged members and the cost of money to plaintiff. To carry the bonds, plaintiff incurred additional interest and general administration expenses. In order to carry the bonds, plaintiff had to pay interest on borrowed funds at a rate which exceeded the yield of the bonds. Although defendant is correct that the yield on FNMA bonds sometimes exceeded the effective rate of outstanding consolidated bonds, on net plaintiff incurred a cost that was substantial.

Interest income from bonds plaintiff held for liquidity purposes is patronage sourced because the transactions involved are directly related to plaintiff's services to its patrons. They were a prerequisite to plaintiff's functions. Unless the bonds were held, plaintiff could not issue consolidated bonds, the primary source of loan funds for its patrons.

*Sale of Automobile* [The discussion of this issue is by the court, in place of the trial judge's discussion.]

During fiscal year 1972, plaintiff realized a gain of $386 from the sale of an automobile that had been used solely in its business as a pool car by plaintiff's officers and staff. During the years the plaintiff owned the automobile, it took depreciation on the car and treated that depreciation as a patronage expense that offset its patronage sourced income and thus reduced the patronage dividends paid to its members. The gain plaintiff had upon the sale of the automobile reflected the recapture, pursuant to section 1245 of the Code, of depreciation previously taken on the car.

The plaintiff reported this gain as ordinary income and as patronage sourced. The Commissioner classified the gain as nonpatronage sourced on the ground that it was income from the sale of a capital asset, which Treasury Regulation § 1.1382–3(c)(2) includes as an example of income derived from sources other than patronage. The treatment was erroneous, however, since the car was not a capital asset under section 1221 of the Code, which excludes from the definition of capital assets "(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167." The car was used in the plaintiff's business, and depreciation properly was taken on it.

■ The gain on the sale of the automobile was patronage sourced because, like the income from the plaintiff's surplus funds and from its liquidity assets, it was "directly related" to the plaintiff's normal activi-

ties. The automobile was one of three used in the plaintiff's business, and the cost of operating it, including depreciation, was treated as an expense of serving plaintiff's patrons. The sale of the car when it was no longer needed for plaintiff's business, was closely related to and stemmed from the prior use of the car. Depreciable assets used in a business wear out and become obsolete, and when that happens, frequently they are sold or traded in for a replacement. Indeed, plaintiff's normal practice upon selling its automobiles was to subtract any gain upon the sale of the used vehicle from the list price of the new vehicle and to carry the new vehicle at the net price; the sale of the automobile for cash in 1972 was inadvertent. It would be anomalous to treat the gain upon the sale of the automobile resulting from the recapture of excess depreciation as nonpatronage sourced when the depreciation itself was treated as patronage sourced.

The Commissioner has recognized that in such circumstances the gain on the sale of the equipment is patronage sourced. In Rev.Rul. 74–84, 1974–1 C.B. 244, the taxpayer, a nonexempt cooperative, sold at a gain machinery used in its manufacturing operations on which it had taken depreciation. The Commissioner ruled that the "portion of the gain from the sale of machinery treated as ordinary income under section 1245 of the Code is considered patronage sourced income because, in effect, the taxpayer is merely recapturing income that otherwise would have been available for distribution as a patronage dividend." Indeed, in its brief to the trial judge the defendant itself stated that "taxpayer properly reported this gain [on the sale of the automobile] as patronage sourced income." We agree with that view.

## CONCLUSION

The plaintiff is entitled to recover on its three claims. The case is remanded to the Trial Division to determine the amount of recovery pursuant to Rule 131(c).