**CALDWELL SUGARS CO–OP., INC.**

v.

**UNITED STATES of America.**

**Civ. A. No. 88–0336.**

United States District Court,
E.D. Louisiana.

Aug. 30, 1988.

---

**660**

Simon, Peragine, Smith & Redfearn, H. Paul Simon, T.A., Charles C. Coffee, New Orleans, La., for Caldwell Sugars Co–Op., Inc.

John Volz, U.S. Atty., Eneid A. Francis, Asst. U.S. Atty., New Orleans, La., Paul M. Predmore, T.A., Tax Div., Dept. of Justice, Washington, D.C., for U.S.

## OPINION

ARCENEAUX, District Judge.

This matter comes to the Court on a set of facts to which both parties have stipulated. The essence of those facts is stated below.

## FACTS

Caldwell Sugars Co-op., Inc. ("Caldwell") is a classic kind of corporate structure known as a cooperative; its members are producers of sugarcane who have joined together, as the law both permits and encourages, to manufacture, process, handle, market, buy, sell, and ship sugarcane and sugarcane products for their mutual benefit. As a nonexempt farmers' cooperative corporation, Caldwell's taxable income for its taxable year ended March 31, 1980, is determinable in accordance with the provisions of Subchapter T of the Internal Revenue Code of 1954, 26 U.S.C. §§ 1381–88 ("the Code").

In December, 1978, the Commodity Credit Corporation ("CCC"), a federal agency, made nonrecourse loans to Caldwell as part of the federal price support program. The sole collateral pledged as security for these loans was a quantity of raw cane sugar stored by Caldwell on its premises. The loans had an original maturity date of November 30, 1979. From the date the loan was granted until the original maturity date, Caldwell was responsible for the cost of storage of the sugar. However, on November 29, 1979, Acting Secretary of Agriculture Jim Williams announced that CCC loans on cane sugar were eligible under the "reseal" program for extensions of their maturity dates until June 30, 1980. By federal regulation, storage costs for the pledged raw sugar during the extended period were to be borne by the CCC.

Caldwell obtained an extension of the maturity date of its loans until June 30, 1980. By the close of its taxable year of March 31, 1980, Caldwell had received from CCC storage credits in the amount of $82,578.00 in return for its storage of the pledged raw sugar.

In its federal income tax return for its taxable year ended March 31, 1980, Caldwell reported as part of its total "patronage dividend" deduction the portion of the storage costs paid by CCC which represented the proportion Caldwell's business done with its "members patrons" (i.e., producers of cane sugar who were members of the cooperative and who did business with the cooperative) bore to its overall business with both member and nonmember patrons. Because 87.555% of Caldwell's overall business consisted of transactions with members patrons, Caldwell treated 87.555% (or $72,293) of the $82,568 as deductible income. After an examination of Caldwell's federal income tax return, the Internal Revenue Service ("IRS") disallowed the claimed deduction of $72,293 as a patronage dividend deduction. The IRS made a deficiency assessment, which Caldwell paid, and Caldwell instituted the present refund suit.

## LAW

Section 1382(b) of the Code provides that "patronage dividends" shall not be taken into account in determining the taxable income of a cooperative. Section 1388(a) defines patronage dividends to mean:

an amount paid to a patron by an organization to which part I of this subchapter applies—

(1) on the basis of quantity or value of business done *with or for* such patron.

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done *with or for* its patrons. Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings from business done *with or for* other patrons to whom no amounts are paid, with respect to substantially identical transactions. (emphasis added)

Treas.Reg. 1.1382–3(c)(2) defines "income derived from source other than patronage" to include "incidental income derived from source not directly related to the marketing, purchasing, or service activities of the cooperative association."

The IRS has twice addressed whether such payments from the CCC constitute income from "business done with or for such patron." In Revenue Ruling 59–107, the IRS held that:

[W]hen, as part of the price support program, money is loaned to a farmer/producer on his warehouse receipt for grain stored in a nonexempt cooperative, storage charges paid by the Commodity Credit Corporation for the period prior to default are income allowable to members as patronage dividends and are excludable from the cooperative's income if there was a pre-existing obligation to allocate such patronage income.

The storage charges paid by the Commodity Credit Corporation for the period following default constitutes income not derived from patronage, as the grain at that time belongs to the Commodity Credit Corporation ... In either case, allocations to the patron are taxable income to the patron.

In Revenue Ruling 70–25, the IRS concluded that payments by the CCC to a cooperative during the period of a loan extension, when title to the pledged commodity remains with the cooperative, should be treated as taxable income. The IRS noted that the CCC is solely liable for payment of storage charges during the extension period, and may not collect them from the producer. The IRS held that:

[T]he handling and storage charges paid to the cooperative association under the reseal program by the Commodity Credit Corporation for which it is solely liable is income of the cooperative association derived from business done with or for the United State or any of its agencies and is income not derived from patronage sources.

Caldwell contends that Revenue Ruling 70–25 is unsound and should be rejected by the Court. Caldwell has pointed to judicial decisions which appear to adopt a broader definition of patronage-sourced income than that espoused by the IRS. In *Land O'Lakes, Inc. v. United States*, 470 F.Supp. 238 (D.Minn.1979), dividends on stock required to be purchased by a nonexempt cooperative to obtain loans needed to facilitate the cooperative's marketing and purchasing activities constituted patronage income.

In *St. Louis Bank for Cooperatives v. United States*, 624 F.2d 1041, 224 Ct.Cl. 289 (1980), the Court gave great weight to Treas.Reg. § 1.1382–3(c)(2) (quoted herein *supra*), and held that the following revenues of a cooperative consisting of financial institutions were patronage-sourced income: (1) interest on demand deposits in farm credit banks and loans to brokerage firms; (2) interest on federal bonds purchased to maintain liquidity; and (3) profit from the sale of an automobile used in the business of the cooperative. The Court based its holding in part on Revenue Ruling 75–228, which stated that income is patronage-based if it is "produced by a transaction directly connected with market-

ing patrons' products." The Court rejected the government's reliance on a supposedly more specific ruling, stating that the ruling did not apply the "directly related" test and was too conclusory to be given weight. *St. Louis Bank*, 624 F.2d at 1051. Finally, the Court stated its view as to the type of transaction which is "directly related" with patronage business:

> Transactions with third parties that are reasonably related to the business which a cooperative conducts with its patrons, and which benefits the patrons other than incidentally through the generation of extra income, is business "with or for" patrons.

*Id.* at 1051–52; *see also Cotter and Company v. United States*, 765 F.2d 1102 (Fed. Cir.1985) ("If the income is produced by a transaction which actually facilitates the accomplishment of the cooperative's marketing, purchasing, or service activities, the income is from patronage services.").

The Government concedes, as concede it must, that storage and handling charges paid by the CCC for the storage and handling of agricultural commodities prior to default are patronage income, and therefore not income derived from business done with the Government. Yet it nevertheless insists that under the reseal program, even though no default has occurred, and the loan period actually extended, CCC storage and handling payments, are somehow transformed into income derived from doing business with the CCC.

The former position is contained in Revenue Ruling 59–107, and the latter in Revenue Ruling 70–25.

■ The 1959 Revenue Ruling is well founded. It draws a proper distinction between storage and handling charges generated before the date of maturity, and storage and handling charges after the takeover date, that is, the date when title to the stored commodity becomes the property of the Government pursuant to the terms of the non-recourse loan.

The distinction is elemental: in one case, the stored commodity remains the property of the producer while, in the latter instance, the commodity has become the property of the Government. Thus, surely, when a cooperative stores government property, the income produced by such storage is income from business done with the Government.

Simply stating the distinction brings into focus the logical test articulated in Revenue Ruling 59–107: if the property stored belongs to the farmer, the income derived from such storage is income derived from that farmer, and therefore patronage income. Where the property stored is the property of the Government, then the income yielded by such storage is income yielded from doing business with the Government.

■ Revenue Ruling 70–25 recognizes and confirms the former position, and yet, for some inexplicable reason, abandons the clear logic of its predecessor, and holds that even if the loan periods are extended, the default dates postponed, and property which otherwise would have been "taken over" by the Government nevertheless remains the property of the farmer, charges generated from the storage of such farmer-owned property acquires a new, different, and totally metamorphic status of government income. This position is supported only by the IRS statement. It provides no accompanying logical reason for adopting what the Government perceives to be a severe distinction.

Since the Court finds that the government did not own the stored sugar under the reseal program, both fundamental fairness and basic consistency require the Court to hold that income derived from the "reseal" storage was not government income.

But aside from logic and consistency, other factors as well support this conclusion. Contrary to the government's contentions, the reseal program was not designed "merely to enhance plaintiff's overall profitability". The official position of the USDA makes this point clear.

The Final Impact Statement issued by the U.S.D.A.—Agricultural Stabilization and Conservation Service on November 28, 1979 (Government exhibit II) noted that:

an extension of 1978 crop loans could, however, allow processors to delay forfeiture of their sugar and, should the market strengthen further, induce them to redeem their sugar ... Extension of loan maturity date to June 30, 1980 will enable processors to retain title to loan sugar beyond the November 30, 1979—May 31, 1980 period during which loans would otherwise mature. Processors who elect to extend their outstanding 1978—crop loans would have the opportunity to redeem should market opportunities increase.

Stored sugar, under reseal, bears the same storage burden as that same sugar bore before the extension of loan maturities: title to the stored commodity does not shift to the Government and the processor has the same right to withdraw the stored commodity, pay off the government loans with interest, and otherwise deal with the commodity in the same manner, with the same rights, as though the stored commodity were in the initial, as opposed to the reseal, term of the CCC loan.

It is true that the CCC pays the cost of storage incurred during the reseal period, but the fact of such payment does not transform the proceeds into "income of the cooperative association derived from business done with or for the United States ..." The "business done" remains that of the producer, the owner of the stored commodity. *See St. Louis Bank,* and *Cotter and Company, supra.* At the very least, the income derived is the product of business done *for* the patron (see § 1382(b), supra).

Judgment will be entered in accordance with this opinion.