WASHINGTON-OREGON SHIPPERS COOPERATIVE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Washington-Oregon Shippers Cooperative, Inc. v. Commissioner
Docket No. 21299-81.
United States Tax Court
T.C. Memo 1987-32; 1987 Tax Ct. Memo LEXIS 32; 52 T.C.M. (CCH) 1406; T.C.M. (RIA) 87032; January 14, 1987. Mark J. Rosenblum, for the petitioner. Henry Thomas Schafer, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $801 and $1,697 for the taxable years 1977 and 1978, respectively. After concessions, the issues are whether certain interest income was "from business done with or for * * * patrons" within the meaning of section 1388(a)(3)[1] and, if so, whether it was also income "derived * * * from members or transactions with members" within the meaning of section 277(a). *34 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts, as orally corrected at trial, and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Washington-Oregon Shippers Cooperative, Inc., is a nonprofit cooperative corporation formed on October 29, 1953, in accordance with the laws of the State of Washington. Since its formation, and at the time the petition was filed in this case, petitioner's principal business office has been located in Seattle, Washington. Petitioner reports its income under the accrual method of accounting and on a calendar year basis. Petitioner timely filed its 1977 and 1978 U.S. Corporation Income Tax Returns (Forms 1120) with the Internal Revenue Service Center at Ogden, Utah. Petitioner is a nonexempt cooperative within the meaning of section 1381(a)(2). [2] Petitioner's membership is composed of approximately 320 separate business firms and organizations, most of which are located in the Pacific northwest region of the United States. These member business firms and organizations range in size from large, national firms such as J. *35 C. Penney Company to small, local firms. Some state agencies such as the Washington State Liquor Control Board and the Oregon State Department of Liquor Control are members of petitioner. Petitioner operates primarily to furnish services to its members, such services consisting primarily of consolidating and distributing freight for its members. Specifically, petitioner combines small, less-than-truckload size shipments of its members' goods for shipping and distribution purposes. By consolidating smaller shipments of its members' goods bound for common destinations into larger shipments, petitioner can normally reduce the cost its members would otherwise incur for individual shipment of such goods. Petitioner's function is to provide its members with the lowest possible freight rates commensurate with the shipping services the members require. Petitioner has no employees of its own, instead being a client of and operated by the Fred H. Tolan Freight Traffic Service (hereinafter the *36 Tolan partnership). Edward H. Tolan (hereinafter Mr. Tolan) is the partner who is primarily responsible for handling all of petitioner's business matters. Petitioner's chairman of the board and treasurer set the policies and Mr. Tolan executes them, handling all fiscal matters based on those policies. For example, Mr. Tolan determines the freight rates to be charged to petitioner's members. Those freight rates are based on six factors or cost components. The first component is the cost to take goods from the member's point of origin to petitioner's consolidation terminals, there being 18 such consolidation terminals in the country. This cost component varies depending on the member's location and the location of the consolidation terminal in relation thereto. This cost component is an add-on cost item and is not included in the freight rate. [3] The other five cost factors or components that make up the freight rates are: the cost of receiving the goods at the consolidation terminal and loading them onto an outbound unit (steamship container, truck, rail car, etc.); the "line-haul" transportation; unloading the freight at the destination and distribution thereof; and the overhead *37 and administrative cost of managing the entire system. These five cost factors or components making up the freight rates constitute a mixture of both fixed and variable costs. The two key variables in the operation are line-haul cost (converted back to a per-100-weight basis and dependent upon the volume shipped at any given time) and claims or other operating contingencies. The freight rates charged to members are necessarily based on estimates and averages, particularly as to the variable cost factors. Petitioner does not use any Government index or formula in making these estimates but relies instead on its 30 years of experience. Petitioner must estimate the amount of any contingent expenses or liabilities that might arise during a given year, and despite its long experience and rather close estimates on some factors, unanticipated events such as floods, weather delays and damage or other liability claims can and occasionally do result in increased expenses. In setting the freight rates it charges its members, petitioner *38 does not factor in any amount as a profit margin. However, it does try to factor in some reasonable amount for contingencies. Due to the necessarily imprecise nature of certain of petitioner's cost factors, as discussed above, petitioner's cost estimates, and hence the freight rates it charged its members in 1977 and 1978, exceeded the actual costs of rendering services to its members. That excess of the freight rates charged to petitioner's members over actual costs will be referred to hereinafter as "excess operating funds." [4]
During each year Mr. Tolan regularly scrutinized petitioner's checking account on a daily basis, trying to anticipate receipts and disbursements. Petitioner's members were required by its bylaws to pay for the freight services within seven days after billing, and petitioner usually got about 90 percent of its money from its members within 30 days after billing. During the years before the Court, there were no penalties or charges to the members for late payments. While he regularly *39 reviewed the checking account, Mr. Tolan did not adjust any surplus in the checking account on a daily basis or on any other regular basis. However, from time to time when he determined there were excess operating funds in the checking account, Mr. Tolan purchased financial instruments with such excess or transferred such excess to an interest-bearing savings account maintained by petitioner with the Peoples National Bank of Washington. The record shows a few deposits into and withdrawals from the savings account, in each instance in a substantial sum. Except for one instance where $300,000 was withdrawn from the savings account to purchase a 90-day certificate of deposit (CD), the record does not show for what purpose the other withdrawals were made. [5]
*40 Rather than deposit the excess operating funds into the savings account, Mr. Tolan occasionally purchased a Treasury bill (T-bill) or CD with those excess funds. His decision to purchase a T-bill or CD was based on the higher rate of interest such an instrument would yield compared to the interest rate on the savings account funds. The source of all of the funds deposited into the savings account and/or used to purchase financial instruments was excess operating funds. All of the interest generated by the savings account and those financial instruments was either used in petitioner's cooperative freight consolidation activities or ultimately refunded to the members as part of the annual distribution of patronage dividends. However, when setting the freight rates to be charged to members for the next year, Mr. Tolan considered the amount of interest income that would be earned on excess operating funds. The anticipated amount of such interest income had a direct, albeit small, impact on the freight rates charged to the members the next year. The specific details of petitioner's various interest-generating transactions will be set out below. In the last quarter of 1975, petitioner *41 had excess operating funds on hand. On October 24, 1975, petitioner used such funds to purchase a 90-day T-bill in the face amount of $50,000 with a maturity date of January 22, 1976. On January 22, 1976, petitioner received income of $153.05 from that T-bill. About the time the T-bill matured, an amount of $50,000 was loaned to the Tolan partnership or to Mr. Tolan to be used exclusively to construct a terminal facility in Fairbanks, Alaska for the use of petitioner's members.That loan was evidenced by a promissory note (the Tolan note) payable to petitioner in the total sum of $50,000, with a variable interest rate of one percent under the prime rate. In 1976 and 1977, petitioner earned interest on the Tolan note in the amounts of $2,103.69 and $1,018.47, respectively. Also during 1976, petitioner had made a loan to B & W Trucks Transfer in the amount of $10,000. That loan evidenced by a promissory note (the B & W note) was made to induce B & W Trucks Transfer to distribute the freight of petitioner's members in the State of Alaska. The B & W note was issued on January 11, 1976, with payment due on April 10, 1977, at an interest rate of 8-3/4 percent per annum. During 1977 *42 petitioner earned interest in the amount of $218.75 on the B & W note. On June 16, 1977, petitioner opened the savings account with the Peoples National Bank of Washington with a deposit of $100. Through November of that year, petitioner made three deposits of $75,000, $100,000 and $150,000. In November of 1977, petitioner withdrew $300,000 from the savings account and purchased a $300,000 CD from the Peoples National Bank. That 90-day CD bore interest at the rate of 6-1/2 percent and matured on February 16, 1978. Later in 1977, petitioner deposited another $100,000 of excess operating funds into the savings account. At the end of 1977, the balance in the savings account was $127,591.22. During 1977, petitioner earned interest of $1,491.04 on the savings account ad $2,297.26 on the CD. In 1978 when the $300,000 CD matured in February, petitioner purchased another 90-day CD from the Peoples National Bank in an amount of $200,000. At the same time, on or about February 15, 1978, petitioner also withdrew $127,491.22 from the savings account, leaving a balance in that savings account of only $100. The record does not show whether that $127,491.22 withdrawal was used as operating *43 funds for petitioner's cooperative business, used to purchase an interest-bearing instrument, or used for some other purpose. The $200,000 CD matured on May 17, 1978, and the record does not show whether the proceeds were thereafter used as operating funds or working capital in petitioner's cooperative business, used to purchase another interest-bearing instrument, or used for some other purpose. For the rest of 1978, there were deposits into the savings account ($10,000, $100,000, and $50,000) and withdrawals therefrom, including withdrawal of some of the interest ($100,000 and $62,000). While the deposits were deposits of excess operating funds, the record does not establish the use to which the withdrawals were put. At the end of 1978, the balance in the savings account was $743.26. [6] In 1978 petitioner received interest income of $2,510.97 on the $300,000 CD and $3,328.77 on the $200,000 CD for a total of $5,839.74 from the CD's. Petitioner also received interest of $2,643.44 from the savings account that year. *44 Petitioner's total interest income from all of the above-described transactions was as follows: Year
Promissory Notes
T-bills
CD's
Savings Account
Total
1976
$2,103.69
$153.05
$2,256.74
1977
1,237.22
$2,297.26
$1,491.04
5,025.52
1978
5,839.74
2,643.44
8,483.18
The year 1976 is before the Court only because of a net operating loss carryover of ($976) from that year. On its Form 1120 for each year, petitioner reported all of this interest in income and included this interest in its computation of its patronage dividend deduction. As obligated by its Articles of Incorporation, during its 1976, 1977, and 1978 taxable years, petitioner refunded to its members all net earnings of the cooperative that it considered to be attributable to services carried on with or for its members. Such refunds did not necessarily require withdrawal of the excess operating funds petitioner had deposited in its savings account or used to purchase T-bill's or CD's. The refunds were made in a single payment, usually in July, by which time excess operating funds attributable to the succeeding year could be used to make such refunds. Such refunds *45 were always made within eight and one-half months of the close of the calendar year to which the net earnings were attributable, and petitioner claimed "patronage dividend" deductions therefor under section 1382(b)(1). In computing the amount of its allowable section 1382(b)(1) patronage dividend deduction for its 1976, 1977, and 1978 taxable years, petitioner included the full amount of the interest earned each year as part of the "net earnings * * * from business done with or for * * * patrons" within the meaning of section 1388(a)(3). The amount of the section 1382(b)(1) patronage dividend deduction claimed in each year was therefore accordingly increased by and reflected the amount of interest income earned in such year. In a statutory notice of deficiency dated May 18, 1981, respondent, citing section 277 as authority for his determinations, reduced the "membership" income by the amounts of the interest income reported on petitioner's 1977 and 1978 tax returns. Technically respondent did not disallow any of the patronage dividend deductions, leaving "membership deductions" unchanged, [7] but in effect has done so. [8] The specific details of respondent's various adjustments *46 are set out in the parties' stipulation of facts and need not be repeated here. *47 OPINION Petitioner, a nonexempt freight consolidation cooperative, derived interest income from a loan made to encourage construction of a freight terminal (Tolan note), a loan made to encourage distribution of its members' goods in Alaska (B & W note), a T-bill, two CD's, and a savings account. Respondent having now conceded the interest income generated by the Tolan and B & W notes to be patronage-sourced, the main issue in this case is whether the interest income petitioner earned from its T-bill, CD's and savings account constitutes "earnings * * * from business done with or for its patrons" within the meaning of section 1388(a)(3), rendering distributions thereof deductible as patronage dividends under section 1382(b)(1). In the case of a corporation which, like petitioner, operates on a cooperative basis, subchapter T of the Code (sections 1381-1388) provides specific rules governing the tax treatment of patronage dividends with respect to both the cooperative distributing such amounts and the patrons who receive them. The term "patronage dividend" is defined in section 1388(a). [9] In order for a distribution to qualify as such, the amount of such distribution must be *48 "determined by reference to the net earnings of the organization from business done with or for its patrons." Sec. 1388(a)(3). Further, the flush language of section 1388(a) specifically provides that "[s]uch term does not include any amount paid to a patron to the extent * * * such amount is out of earnings other than from business done with or for patrons * * *." See also sec. 1.1388-1(a)(2)(i), Income Tax Regs. Thus, only earnings which are "patronage-sourced" may be distributed as deductible patronage dividends. *49 We have recently had occasion to reexamine carefully this whole area of patronage-sourced income under subchapter T, specifically involving interest income derived from a cooperative's excess operating funds or temporary surplus of working capital. Illinois Grain Corporation v. Commissioner,87 T.C. 435 (1986). The test is whether the income is so closely intertwined with and inseparable from the main cooperative activity that it is directly related to, and inseparable from, the cooperative's business so as to actually facilitate the accomplishment of the cooperative's business purpose. This "directly related" test is, however, necessarily fact-intensive. In Illinois Grain, the nonexempt cooperative purchased, distributed, and sold its patrons' grains, principally corn and soybeans. [10] There was great price volatility in the grain business, creating sudden cash demands for increases in margin requirements and changes in inventory values. The cooperative needed a great deal of flexibility in the form of liquidity to fund changes in the current assets and liabilities. At times the cooperative was short of working capital and at times it had a temporary surplus *50 in working capital. The cooperative was undercapitalized, had extensive long-term debt, and had rapidly fluctuating short-term debt in the form of notes payable, all of which generated both deficits and surpluses of working capital at different times. The cooperative was engaged in hedging transactions as an integral and necessary part of its grain business, resulting in increases and decreases in margin calls on a daily basis. In managing its deferred pricing program with its members, its members' notes, and its hedging transactions, the cooperative had to assess its cash needs each day before the close of the grain markets. Margin requirements had to be posted within 45 minutes of the closing of the market. If there was any surplus working capital on a given day, the cooperative first paid back short-term borrowings, either short-term bank loans or members' notes, and if there was still any excess would purchase short-term instruments -- commercial paper, certificates of deposit, Treasury bills, or repurchase agreements. These short-term instruments had lower interest rates than it could have earned elsewhere. Of these interest-bearing instruments, 72 percent of them were for *51 overnight or overweekend periods, 21 percent for one week or less, and the remainder for periods more than a week. For those instruments for more than a week, many were in December when the cooperative knew it would not need the funds until January. There was a high level of overnight transactions because the cooperative never knew when it would again need the temporary surplus working capital in its business. Respondent treated all of this interest income as nonpatronage-sourced income. Recognizing that application of the "directly related" test depends upon all of the facts and circumstances of the particular case, the Court disagreed with respondent stating: As the cases make clear, such a determination is necessarily fact-intensive. Income derived by a cooperative from its various business activities may indeed be so closely intertwined and inseparable from the main cooperative effort that it may be properly characterized as directly related to, and inseparable from, the cooperative's principal business activity, and thus can be found to "actually facilitate" the accomplishment of the cooperative's business purpose. On the other hand, it is equally possible that a cooperative *52 may undertake business activities which while profitable, have no integral and necessary linkage to the cooperative enterprise, so that it may fairly be said that the income from such activities does nothing more than add to the taxpayer's overall profitability. It all depends on the facts of each case. In the instant case, we consider the facts with respect to each type of income separately. 1. The Interest Income
The facts in this case show that petitioner's principal cooperative enterprise was the marketing of its patrons' grain. The financing of this enterprise was complex and called for petitioner's constant attention and management of its money so as to have available on short notice large amounts of cash to meet margin calls, to repay members' notes, to satisfy patrons' demands under the deferred pricing arrangements which petitioner had with its patrons, and to pay its current bills. On the other hand, petitioner received funds, not entirely on a predictable basis, from sales (reducing its inventories), and from lessening margin requirements (which fluctuated on a daily basis), as well as from its long-term and short-term borrowings. Although petitioner analyzed *53 its cash needs on a daily basis, it could not always be precise. On some days, petitioner had to exercise its short-term line of credit to borrow from the First National Bank or the St. Louis Bank. On other days, petitioner would find itself in a surplus cash position. When the latter event occurred, petitioner, in the exercise of ordinary prudent business management, placed its temporary surplus funds in extremely short-term debt instruments -- for the most part, overnight or overweekend loans to the First National Bank, or its wholly-owned subsidiary. The primary purpose here was not to "invest," but to find a temporary parking place for its surplus funds, consistent with safety and prudent money management. We do not agree with respondent's contention that such placement of temporary surplus funds in short-term debt instruments constituted an "investment" of such funds, as that term would generally be understood. Petitioner's actions here were entirely comparable to placing the funds in a bank account. One does not make an "investment" in a bank account. The rate of interest which petitioner earned on these extremely short-term placements was less, as we have found, than *54 the interest which petitioner could have earned elsewhere on longer-term debt instruments. In short, we are convinced that petitioner's money management activities in this case were inseparably intertwined with the overall conduct of its cooperative enterprise, and the interest income which it earned was therefore patronage sourced, to the same extent as in the Cotter [Cotter and Co. v. United States,765 F.2d 1102 (Fed. Cir. 1985)] and St. Louis Bank [St. Louis Bank for Cooperatives v. United States,624 F.2d 1041 (Ct. Cl. 1980)] cases. Illinois Grain Corporation v. Commissioner,supra,87 T.C. at 459-460. While in the instant case the cooperative's business activities are less volatile and considerably more static than those in Illinois Grain Corporation v. Commissioner,supra, *55 the "directly related" test, here as in that case, must be applied to the business activity of the particular cooperative involved. Petitioner was not dealing in a grain market dramatically fluctuating on a daily basis. Its cooperative activities were more narrowly focused on freight consolidation services for its members. Petitioner was a small, essentially single-person (Mr. Tolan) operation, and its money management activities were considerably less systematized than those in Illinois Grain. Nonetheless, we must consider the relationship of the activity generating the income to the particular activities of the cooperative to determine if it is integrally related to the cooperative's business and actually facilitates the accomplishment of the cooperative's business purpose. On the record in this case, we cannot find the integral and necessary linkage between petitioner's money management activities and its overall conduct of its cooperative enterprise such as we found in Illinois Grain. We conclude that petitioner's money management activities did nothing more than add, if only in a small way, to its overall profitability. Petitioner seems to think that all it needs *56 to establish is that the source of the funds that generated the interest is excess operating funds. Mr. Tolan testified categorically, and we believed him, that the source of the funds for the Tolan loan, the B & W loan, the T-bill, two CD's, and the savings account was in each instance excess operating funds. That alone does not transmute the interest income therefrom into patronage-sourced income. Mr. Tolan also testified, and we believed him, that the resulting interest income was used in petitioner's operations and that when he set the freight rates to be charged to the members the next year, he took into account the amount of interest that could be earned on the excess operating funds. In other words, petitioner argues that the interest income was used to reduce the freight rates charged to its members. Again that does not transmute the interest income into patronage-sourced income. The impact of this interest income on the freight rates charged to the members was rather minimal here. Nevertheless Mr. Tolan readily agreed that if more interest were earned, it would have a greater impact on those freight rates and that the cooperative would reduce the rates charged to its *57 members "dependent upon the dollars generated from the interest income." That sounds more like a separate investment activity than necessary money management incident to the conduct of the cooperative's business. In the case of the Tolan loan made to induce construction of a freight terminal for the members' use and the B & W loan to induce the trucking company to distribute the members' goods in Alaska, there is a clear nexus between the interest income generating activity and the overall conduct of petitioner's freight consolidation cooperative business. Respondent has now conceded that the interest from those loans is patronage-sourced income. After respondent's concessions, the interest items remaining in dispute are the savings account and the 90-day financial instruments purchased by petitioner. As to the $50,000 T-bill purchased in October of 1975, the record hints, but does not clearly establish, that when this T-bill matured in early 1976 it may have been the source of the funds for the Tolan loan. If established, that fact might furnish a linkage, though admittedly a rather attenuated one, between the T-bill and the cooperative's activity of securing construction of *58 the terminal. On balance, we can only conclude that even with such an indirect connection, the 90-day T-bill can only be viewed as an investment that merely added to overall profitability. As to the 90-day instruments generally, we are troubled by the rather long term involved, this being more akin to an investment than to temporary money management integrally related to the ongoing conduct of the cooperative's business activities. [11] Unanswered questions involving the two 90-day CD's tend to tilt them toward the category of investments. As will be discussed more fully below in connection with the savings account interest, the pattern, if any, in this case is a few scattered transactions involving rather substantial sums of money on those few occasions. Again this suggests investments, not regular money management activities integrally and necessarily linked to the cooperative's business activities. *59 In November of 1977, petitioner withdrew $300,000 from its savings account and purchased a 90-day CD. The decision to put the money into a CD was based on the fact that interest on a CD was higher than interest on the savings account. When that CD matured in early 1978, another 90-day CD in the amount of $200,000 was purchased. Thus, with the purchase of that second CD, petitioner had an amount of at least $200,000 tied up in CD's for a combined period of at least 180 days, which strongly suggests investment, not regular, routine money management in the active conduct of a cooperative business. The record does not show what happened to the other $100,000 of the first CD. Again, the $200,000 CD matured in May of 1978 and the record does not tell us what happened to that principal amount. Similarly, the record leaves unanswered questions in regard to the savings account deposits and withdrawals. Although Mr. Tolan testified the money in the savings account could be withdrawn when and if needed in petitioner's operations, the withdrawals were few and far between and always in a substantial amount. [12] The pattern of just a few deposits and withdrawals of substantial sums is troubling *60 and seems more consistent with an investment activity than regular business operations. While Mr. Tolan scrutinized petitioner's checking account every day trying to anticipate receipts and disbursements, he did not adjust surplus in the checking account on a daily basis or on any other regular basis. The record does not show how, when, or on what basis Mr. Tolan determined there were excess operating funds. When asked to explain how he determined the amount to be placed into a T-bill or CD, for example, Mr. Tolan testified as follows: We basically looked at our checking account balance that we would get from the bank, and if we saw it consistently running at a certain level, then we felt it would probably be proper to pull $100,000 or $50,000 or whatever might be out of the checking account and place them in a CD or whatever the instrument might be. That sounds like an investment, not routine *61 money management. Moreover, the one somewhat-documented transaction in the record -- the purchase of the $300,000 CD -- shows that the money was taken out of the savings account, not the checking account, and placed in a CD because the interest rate was higher than that for the savings account. In either event, this is indicative of a separate investment activity, not regular money management incident to its cooperative business activities. From time to time, Mr. Tolan transferred funds from the checking account to the savings account. He opened the savings account in June of 1977 with a deposit of $100. Through November of that year he made three deposits of $75,000, $100,000, and $150,000. Then in November he withdrew $300,000 from the savings account to purchase the 90-day CD. Then he deposited another $100,000 into the savings account and had a balance of $127,591.22 in that account at the end of the year. As noted earlier, when that CD matured in February of 1978, $200,000 was again used to purchase another 90-day CD. About the same time petitioner withdrew $127,491.22 from the savings account, the entire balance except for $100. The record does not show what happened *62 to the $127,491.22. Similarly, for the rest of 1978, Mr. Tolan deposited $10,000, $100,000, and $50,000 and then withdrew $100,000 and $62,000. While we accept Mr. Tolan's testimony that the source of all deposits was excess operating funds, we are not satisfied as to what the withdrawals were used for. The record is simply devoid of any facts correlating either the deposits into or the withdrawals from that savings account with petitioner's ongoing cooperative business activities. For the reasons stated above, we conclude that the interest income from the T-bill, the two CD's, and the savings account did not constitute patronage-sourced income under subchapter T. In view of this holding, we need not reach respondent's alternative arguments under section 277. [13]
*63 To reflect our holding, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties have stipulated that petitioner is also a membership organization operated primarily to furnish services to its members and is subject to section 277. See n. 13, infra.↩
3. Either the item was separately billed to the member or the member at the outset paid the cost of delivering the goods to the consolidation terminal.↩
4. Respondent objects to the term "excess operating funds," preferring instead the description "idle surplus." We think this a semantic quibble without a difference.↩
5. While Mr. Tolan testified that the funds in the savings account could be taken out when and if needed for petitioner's operations, the record does not establish that any of the withdrawals in 1977 and 1978, the years before the Court, were ever redeposited into the checking account or otherwise used in petitioner's cooperative activities. On the savings account statement in evidence, there is a handwritten note indicating that in 1979 a $49,000 withdrawal was deposited into the checking account and that in 1980 a $50,000 withdrawal was deposited into the checking account. Those two redeposits would tend to suggest that the funds were again available for use as operating funds or working capital, but do not establish that the funds were necessarily so used. Mr. Tolan testified that he made withdrawals from the checking account to purchase financial instruments such as a CD.↩
6. The savings account record also reflects a similar pattern of deposits and withdrawals in 1979 and 1980, with ending balances of $387.71 and $723.73, respectively. The record does not show whether or not any of these excess operating funds were placed into 90-day T-bills or CD's in 1979 and 1980, or whether the withdrawals were to meet operating needs of petitioner's cooperative business or some other purpose.↩
7. We note, however, that in his notice of deficiency respondent allowed petitioner an additional patronage dividend deduction in the amount of $1,018 for taxable year 1977, reducing petitioner's taxable income for such year accordingly. This amount was computed with reference to the interest income generated by the Tolan note, which respondent conceded to be patronage-sourced income. Respondent still contends that income was nonmember income. Respondent now concedes that the additional patronage dividend deduction provided for in the notice of deficiency should be further increased to $1,237 so as to take into account the $218.75 of interest received from the B & W note during 1977, which respondent now concedes to be patronage-sourced income. Again respondent still contends that the $218.75 was nonmember income. ↩
8. While respondent's notice of deficiency ostensibly based the adjustments made to petitioner's income therein on the presence of "membership deductions" in excess of "membership income" pursuant to section 277, the parties' stipulations of fact, trial memoranda, and briefs deal extensively with whether the interest income involved herein constitutes "patronage-sourced" income deductible from petitioner's gross income pursuant to section 1382(b)(1). Accordingly, this issue was tried by the consent of the parties hereto. Rule 41(b)(1).↩
9. Section 1388(a) provides as follows: (a) Patronage Dividend. -- For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies -- (1) on the basis of quantity or value of business done with or for such patron, (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.
Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons,↩ or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions. [Emphasis added.]
10. While Illinois Grain had both member and nonmember patrons, business with nonmember patrons was done on a commercial basis, not on a cooperative basis, and the issue of patronage-sourced income and deductible patronage dividends concerned only the member patrons.↩
11. We do not mean to suggest that a 90-day instrument could never come within our holding in Illinois Grain Corporation v. Commissioner,supra.↩ However, the facts and circumstances surrounding such a long-term instrument must be closely scrutinized in each case.
12. We are not suggesting that there could not be a withdrawal of a substantial sum if there was a business need therefor, and it should not create any undue burden for a cooperative to show that it had a business need for a large sum at some particular time, if that were the fact.↩
13. Our holding that the above interest income is not patronage sourced makes it unnecessary to consider section 277 in regard to the interest from the T-bill, CD's, and savings account. It can be argued that that is all that is in dispute in this case. However, respondent further argues on brief that income that is admittedly patronage-sourced income, such as the interest from the Tolan and B & W notes, nonetheless is not membership income and hence membership deductions are limited to the extent of membership income under section 277. Section 277(a) provides, in pertinent part, that: In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members * * *. If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year. This is a deduction deferral, not a deduction disallowance provision. Petitioner argues that respondent has agreed that this interest is membership income; however, the stipulation clearly describes the Tolan and B & W interest as "non-member, patronage-sourced income." Petitioner next argues that the test for membership income is essentially the same as for patronage-sourced income. We are not prepared in this case to say that "income derived * * * from members or transactions with members" under section 277 necessarily has the same meaning as income "from business done with or for patrons" under section 1388(a). (Emphasis added.) We pretermit the issue in this case for several reasons. Although the parties in this case stipulated that petitioner is a membership organization subject to section 277, there is some doubt, as expressed by commentators, as to the applicability of section 277 to a nonexempt cooperative. See Clark & Erickson, "Taxation of Cooperatives," Tax Mgmt. 229-2 at A-19 (BNA 1984). We can of course disregard the parties' stipulation to the extent it constitutes a legal conclusion. Without conclusively resolving this matter, we note that in the only case in which we have directly addressed the issue, we found section 277 inapplicable to that nonexempt cooperative. Farm Service Cooperative v. Commissioner,70 T.C. 145, 155-157 (1978), revd. on another issue 619 F.2d 718 (8th Cir. 1980). In Farm Service Cooperative we found that the losses were not intentionally generated to shelter income from nonmembership sources. Consequently, we concluded there that the cooperative did not come within section 277 because "Congress enacted section 277 to attack sham losses, those losses that were constantly and intentionally generated in dealings with members so that the profits from commercial ventures -- such as investment activities- -could be passed on to such members free of tax." 70 T.C. at 156. See also S. Rept. 91-552, 1969-3 C.B. 423, 471; Summary of H.R. 13270 Tax Reform Act of 1969, prepared by the staffs of the Joint Committee on Internal Revenue Taxation and the Committee on Finance, 91st Cong., 1st Sess. 30; and General Explanation of the Tax Reform Act of 1969, prepared by the Joint Committee on Internal Revenue Taxation, 91st Cong., 2d Sess. 72. While respondent argues here that petitioner in effect furnished freight services to its members below cost, that clearly is not the case. The excess operating funds were the result of the fact that petitioner charged its members more than cost. Thus, the fact pattern of the present case, like that in Farm Service Cooperative, does not come within the general intendment of section 277. Respondent's argument might have more force if a nonexempt cooperative were deliberately overstating its charges to its members in order to generate funds for investment purposes. There is no suggestion that petitioner was engaged in such a practice during the years before the Court. A further reason for declining to consider the section 277 issue is that respondent has not sought an increased deficiency even though the Tolan note interest was considered in the statutory notice of deficiency and taxable income reduced by the additional patronage deduction allowed therefor. That leaves only the $218.75 interest on the B & W note. Since respondent stipulated that the patronage dividend for 1977 should be increased by this amount, that could perhaps be handled in a Rule 155 computation. However, the record indicates that petitioner on its tax returns included all of the interest income in computing its patronage dividend deductions. Accordingly, when respondent again reduced the taxable income by the $1,018 patronage dividend in regard to the Tolan note interest, that was probably a duplication. Consequently, we leave the parties where we find them and make no adjustments to the deficiencies in the statutory notice.↩