## CF INDUSTRIES, INCORPORATED (AND SUBSIDIARIES), Petitioner–Appellant/Cross–Appellee,

### v.

## COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee/Cross–Appellant.

### Nos. 92–1579, 92–2046.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1992.

Decided May 26, 1993.

Order on Petition for Rehearing Sept. 14, 1993.

Todd F. Maynes, Raymond P. Wexler (argued), William R. Welke, Kirkland & Ellis, Chicago, IL, for CF Industries, Inc. and Subsidiaries.

Abraham N.M. Shashy, Jr., I.R.S., Richard Farber, Gary R. Allen, Charles Bricken (argued), Joan I. Oppenheimer, James A. Bruton, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for C.I.R.

Before POSNER and RIPPLE, Circuit Judges, and CRABB, Chief District Judge.*

POSNER, Circuit Judge.

The principal difference between the cooperative form of doing business and the ordinary corporate form is that the shareholders of a cooperative share in the cooperative's income in proportion to their purchases from the cooperative rather than to the number of shares they own. Subchapter T of the Internal Revenue Code, 26 U.S.C. §§ 1381–1388, sets forth special rules for the taxation of cooperatives. The rules differ depending on whether the cooperative is an "exempt" coop-

---

* Hon. Barbara B. Crabb of the Western District of Wisconsin, sitting by designation.

erative or a "nonexempt" one, but we are concerned in this case only with the latter. The patronage dividends paid members of a nonexempt cooperative are deductible from the cooperative's gross income, provided (so far as relevant to this case) that they are indeed proportional to purchases rather than to shares and that they are paid out of "net earnings ... from business done with or for its patrons," 26 U.S.C. §§ 1382(b)(1), 1388(a)(3), that is, that they are "patronage sourced." (Exempt cooperatives can deduct earnings paid out in patronage dividends even if the dividends are not patronage sourced, that is, are not derived from business done with or for the members of the cooperative.) These dividends are, however, includable in the gross income of the cooperative members in the year received. 26 U.S.C. § 1385. (There is an exception, irrelevant to this case, for certain consumer cooperatives. 26 U.S.C. § 1385(b)(2).) A Treasury Regulation defines nonpatronage income as "incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association. For example, income derived from ... investment in securities." Treas.Reg. § 1.1382–3(c)(2), 26 C.F.R. § 1.1382–3(c)(2).

CF Industries is a large nonexempt cooperative producer of chemical fertilizers. During the tax years in question (1980 and 1981) it supplied 20 percent of the U.S. market for nitrogen and phosphate fertilizers and 16 percent of the market for potash fertilizers. Shares in the cooperative were owned by eighteen regional farmers' cooperatives, themselves governed by Subchapter T or, in the case of two Canadian cooperatives, by its Canadian equivalent.

CF's members buy fertilizers from CF and resell them to their own members, local farmers' cooperatives that in turn resell to the farmers themselves. Patronage dividends pass down the ladder from CF to the farmer, who deducts from his gross income the cost of the fertilizers that he buys from his cooperative (ultimately from CF) and includes in his gross income for the following year the patronage dividend applicable to that purchase. The dividend is not paid until after the year ends because until then the amount of the dividend, proportioned as it is to the amount of the cooperative member's purchases, cannot be determined. It must be paid within the first eight and a half months of the following year. 26 U.S.C. §§ 1382(b), (d). CF makes some sales to nonmembers but they are not at issue in this case and can be ignored.

The fertilizer industry, reflecting conditions in the agricultural industry that is its only customer, is both highly seasonal and highly volatile. Farmers buy fertilizer primarily in the spring and in the fall, and the amount they buy depends on the vicissitudes of weather, fluctuations in demand for farm products, and other factors difficult to predict. Another source of uncertainty for producers of chemical fertilizers is that the prices of the chemicals that are the principal inputs into such fertilizers also fluctuate a great deal. All this makes cash management a matter of acute concern for an enterprise like CF. It needs more cash in winter and summer, when it is producing for inventory to supply the farmers' needs in the spring and fall, than it does in the spring and fall, when it is selling and being paid for the fertilizer it has produced. It cannot be certain how much cash it must have at any time, because it must have cash to meet sudden increases in the prices of its chemical raw materials and sudden surges in demand for fertilizer, requiring it to expand production on short notice. In fact it cannot forecast its cash needs accurately more than a month in advance, and therefore it wants to be able to increase or reduce its cash balances on short notice. It could try to go cashless and borrow short term whenever it needed cash to pay its bills, or, as it does, it could place some of its assets in short-term financial instruments that are cash equivalents, such as bank certificates of deposit, U.S. government financial instruments, repurchase agreements, and money-market funds—all of which are available with short maturities. Roughly 75 percent of the cash equivalents used by CF in its cash management program have maturities of 7 days or less, and 92 percent have maturities of less than 30 days. A few have much longer maturities but are the equivalent of short-term cash-equivalent

instruments because of conversion features. Apparently the assets in CF's cash-management account are generated by revenues from the sale of the cooperative's products.

In the old days the most important equivalent to cash in the sense of actual currency was money in a demand-deposit bank account, which did not pay interest. Short-term financial instruments pay interest, and the Internal Revenue Service contends that this interest is investment income rather than patronage-sourced income and hence is taxable to the cooperative. The Tax Court disagrees—in part. It believes that the interest income earned by a bona fide cash-management program such as that of CF Industries is patronage sourced provided that the term of the financial instruments bought for the program does not exceed the horizon of foreseeability of the cooperative's cash needs, in this case 30 days. It therefore allowed CF to deduct all the interest income that it received on financial instruments that had a term of 30 days or less, but not the income it received on the minority of instruments that had a longer term. 62 T.C.M. (CCH) 1249, 1991 WL 245208 (1991).

Both parties appeal. Neither defends the 30–day rule, and they are right not to do so. The Tax Court's rationale makes no sense. The closer the horizon of unpredictability, the more not less flexibility in cash management the cooperative needs. The logic of the court's opinion is that if CF could forecast its cash needs only a week in advance, it could not (if it wanted to avoid paying income tax on its interest income) own any financial instruments that matured more than a week after issuance, while if it could forecast its cash needs a year but not two years in advance, it could have financial instruments with terms of up to two years without forfeiting its tax exemption. An enterprise that cannot forecast its cash needs accurately one week in advance cannot forecast them accurately two, or three, or fifty weeks in advance, so it will want to have cash equivalents with staggered maturities to minimize its transaction costs while taking advantage of possibly higher interest rates on longer-term instruments.

The difficult question is whether all or none of CF's interest income obtained from the financial assets of its cash-management program should be deductible from its gross income. The statute, regulation, and legislative history are alike unhelpful. The government argues that financial transactions are not business with or for patrons, but it is obvious that one cannot conduct a fertilizer business without cash, so the transactions in question are plausibly regarded as being "for" the cooperative's patrons. The government also argues that financial instruments are securities and therefore CF is engaged in "investment in securities" (an example in the regulation of what does *not* generate patronage-sourced income) whenever it buys them and earns income on them. But "investment" is not a synonym for "purchase." The word "investment" usually refers to the decision to defer consumption in favor of savings that will generate a return. Although CF is naturally not indifferent to the return on its cash assets, it is more concerned with maturity and thus liquidity, and the very short terms of most of the instruments minimize the risk of default, of unanticipated changes in the rate of inflation, and of fluctuations in the market value of the instruments. CF could borrow to satisfy most or all of its cash needs; sometimes indeed it is a net borrower; but generally it minimizes the cost of satisfying its cash needs by having the cash rather than borrowing it and by lending it out until it needs it.

Parsing the words of the statute and the regulation will thus not resolve this case. We must consider the objective of distinguishing between patronage-sourced and nonpatronage-sourced income. Neither judicial opinions nor scholarly commentary have identified that objective clearly, but we believe it to be bound up with the basic concept of a cooperative. Instead of using its net income, as a regular corporation would, explicitly to compensate the shareholders for furnishing the capital needed by the corporation, a cooperative does the same thing indirectly by in effect transforming that income into lower prices for its shareholder-customers. The price reduction (corresponding to dividends in a regular corporation) takes the form of a rebate rather than a discount because the amount of income available for distribution is not known until the end of the year. But the character of the patronage

dividend as a price reduction is preserved by the fact that the size of the dividend is proportional to the member's purchases. A member who receives a 10 percent patronage dividend has in effect bought a year's worth of goods from the cooperative at a price 10 percent below the nominal price at which he purchased them.

Because the earnings that the cooperative retains are taxed as income to the cooperative, while as already mentioned the earnings that it distributes in the form of patronage dividends are taxed as income to the members of the cooperative who receive them, 26 U.S.C. §§ 1382, 1385, we are not aware of any dramatic opportunities for tax avoidance by use of the cooperative form. But as all regular corporations are required to pay income tax on their interest income, even though it will be taxed again when it is received by the shareholder in the form of a dividend or (if it is retained and as a result boosts the value of the corporation's shares) eventually as a capital gain, it is natural that the government should want to limit the scope of this privilege of cooperatives, not only to increase tax revenues but also to limit tax-motivated creation of cooperatives. If a corporation sold a plant and temporarily invested the proceeds in securities, the income on those proceeds would be taxable to the corporation, even though the corporation was operating in effect as a mutual fund with respect to those proceeds. If a cooperative corporation did the same thing, however, the income would not be taxable—were it not for the regulation defining "patronage sourced" to exclude income from investments in securities.

This case, however, is not within the purpose or scope of the regulation. All CF is trying to do, so far as the record discloses or we can surmise, is to minimize the cost of holding the irreducible minimum of cash that it must hold in order to do business with and for its patrons. It could borrow the cash instead but no one suggests that this would reduce its costs. It could put the money in a safe deposit box, or in non-interest-bearing accounts, but that would just increase its costs, resulting in smaller patronage dividends and, at the bottom of the ladder, smaller additions to farmers' gross income, hence lower taxes—so even the government might be a loser in the long run. The government's lawyer conceded at oral argument that if CF had taken out a long-term loan to fund its cash needs and placed the cash thus obtained in short-term financial instruments until it actually needed the cash to pay its bills, the interest on those instruments would be patronage-sourced income and therefore would not be taxable to the cooperative. We do not think the means by which CF raised the cash that it uses to meet its cash needs is significant. Money has an opportunity cost however obtained and that cost can be reduced by skillful cash management, one aspect of which is short-term lending of cash not immediately needed. Richard Bort, *Corporate Cash Management Handbook* ch. 14 (1989). The requirement of patronage sourcing is satisfied because the earnings on the money in the cash-management account are generated by the bona fide business dealings of the cooperative, as a producer and seller of fertilizers, with or on behalf of its member-customers. CF is not running a mutual fund for its members on the side.

We do not deny the force of the contrary arguments. To allow a cooperative to deduct its cash-management income creates an arbitrary disparity in the tax treatment of the cash-management income of cooperatives and of other forms of non-tax-exempt enterprise, which are required to pay income taxes on all their interest income. (On the other hand, disparity is built into Congress's decision to have special tax rules for cooperatives.) CF's position can also be challenged as placing cooperative taxation on the crest of a steep and slippery slope. Suppose that a cooperative custom-designs some product to the specifications of a member who has ordered it, but the member refuses to accept it when it is delivered and the cooperative to cut its loss "dumps" it on the open market at a fraction of its original price but nevertheless at a small profit. Should that profit be deductible from the cooperative's taxable income, on the ground that the sale of the product on the open market was a prudent, indeed an unavoidable, cost-minimizing response to the member's refusal to buy? If the answer is "yes," could it not then be argued that *all* the income that a cooperative earns on the sales that it makes to nonmembers should be considered patronage-sourced

because, ultimately, the cooperative makes such sales only for the sake of its members? The danger of the slippery slope is aggravated by the fact that there appears to be no limitation, other than what state statutes may or may not impose, on how much business a cooperative can do with nonmembers without forfeiting its cooperative status—the IRS's ruling that to qualify for cooperative status a business "must do more than 50 percent in value, of its business, with members," Rev.Rul. 72–602, 1972–2 Cum.Bull. 510, interpreting 26 U.S.C. § 1381(a)(2), having been rejected by the only appellate court to consider the issue, *Conway County Farmers Ass'n v. United States*, 588 F.2d 592 (8th Cir.1978); see also *Columbus Fruit & Vegetable Cooperative Ass'n, Inc. v. United States*, 7 Cl.Ct. 561 (1985). Especially in so volatile an industry as fertilizers, moreover, prudence dictates that a cooperative producer have the flexibility to sell its surplus output to nonmembers—so cannot the revenues from such sales be considered to be as organic to the cooperative's mission as the earning of interest on the cash it irreducibly requires to carry on its business? To continue very far down this road would be to make nonexempt cooperatives fully tax exempt. The government asks us not to step onto the road in the first place.

However one might weigh the competing considerations as an original matter, the history of the issue counsels against acceptance of the government's position. The statutory provision in question dates back to 1962. A series of early revenue rulings interpreted patronage income broadly. Illustrative is Rev.Rul. 74–160, 1974–1 Cum.Bull. 245, which held that a cooperative could deduct interest on a loan it made to one of its suppliers to enable the supplier to supply the cooperative. The government tries to distinguish that case from this one on the ground that the loan facilitated the purchase of supplies for resale to the cooperative's members. We do not see the distinction. Effective cash management reduces the cost to the cooperative of obtaining supplies for resale to its members.

The government is unwilling to repudiate the early revenue rulings, thus making its position internally inconsistent. It is also inconsistent with the judicial rulings on the question. *Land O'Lakes, Inc. v. United States*, 675 F.2d 988, 993 (8th Cir.1982), held that a cooperative that as a condition of borrowing money from a bank had been required to buy bank shares could deduct the dividends that it received on those shares, since the borrowing was to enable the cooperative to carry on its business for the benefit of its members. Even closer to—indeed it seems to us indistinguishable from—the present case is *St. Louis Bank for Cooperatives v. United States*, 624 F.2d 1041, 224 Ct.Cl. 289 (1980) (per curiam). A cooperative bank obtained its working capital by issuing bonds. Sometimes in deciding on the size of the bond issue the bank overestimated its loan demand and as a result found itself with surplus cash on hand, which it lent out to nonmembers on a short-term basis. The court held that the bank could deduct from its taxable income the interest it received on these short-term loans; the court deemed the interest patronage sourced. Those loans were the equivalent of the financial instruments that CF Industries purchased with its temporarily surplus cash. Yet the Internal Revenue Service appears to accept the reasoning of *St. Louis Bank for Cooperatives*. Private Letter Rulings 85–38–005 (May 31, 1985) and 87–50–002 (July 23, 1987) (both available on LEXIS).

The latest appellate word is *Cotter & Co. v. United States*, 765 F.2d 1102 (Fed.Cir.1985), which reached the same result as *St. Louis Bank for Cooperatives* but on facts that the government *concedes* are indistinguishable from those of this case. There are no other reported cases. Apart from the curious quirk introduced in this case by the 30–day distinction, the Tax Court has fallen in line with *St. Louis Bank for Cooperatives* and *Cotter & Co.* See *Illinois Grain Corp. v. Commissioner*, 87 T.C. 435, 1986 WL 22009 (1986); *Dundee Citrus Growers Ass'n v. Commissioner*, 62 T.C.M. (CCH) 879, 1991 WL 191557 (1991). Although *Certified Grocers of California, Ltd. v. Commissioner*, 88 T.C. 238, 1987 WL 49271 (1987), and *Washington–Oregon Shippers Cooperative, Inc. v. Commissioner*, 52 T.C.M. (CCH) 1406, 1987 WL 40107 (1987), found interest income not to be patronage sourced, in neither case had the cooperative demonstrated that the interest was earned on funds invested pursuant to

**106**

the principles of prudent cash management, so it was possible to infer that the funds really were an investment. 88 T.C. at 243–45; 52 T.C.M. (CCH) at 1412.

The government wants us to reject all the previous appellate decisions in order to create an intercircuit conflict that might invite Supreme Court review. Yet it has neither repudiated nor plausibly distinguished the early revenue rulings that provide the foundation for the judicial decisions. The government is in a dilemma largely of its own creation. It has rested upon a Treasury Regulation that is hopelessly equivocal, and has made, so far as appears, no effort to amend it. It has also failed to identify any abuses—any attempts by cooperatives to act as the tax-exempt investment agents of its members—of the sort the statute and regulation might have been supposed to be aimed at preventing. It invites us to give it a better shot at the Supreme Court by creating an intercircuit conflict. We decline the invitation.

The decision of the Tax Court is modified to allow the taxpayer to deduct all the interest income at issue that it earned in the taxable years in question (1980 and 1981), and as modified is affirmed.

MODIFIED AND AFFIRMED.

### ORDER ON PETITION FOR REHEARING

Sept. 14, 1993.

The government has requested rehearing directed to a single aspect of the case: whether a nonexempt cooperative that has cash-management income it wishes to deduct from its gross income must allocate that income between its members and its other customers, presumably in proportion to their respective purchases from the cooperative. The government points to Rev.Rul. 74–160, 1974–1 Cum.Bull. 245, which requires such an allocation. The issue was not discussed by the Tax Court, and is not the subject of any reported case. In the circumstances we think it best to remand the case in order to give the Tax Court a chance to consider the issue in the first instance. The panel decision is modified accordingly.