CF INDUSTRIES, INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
CF Indus., Inc. v. Commissioner
Docket No. 9420-88
United States Tax Court
T.C. Memo 1991-568; 1991 Tax Ct. Memo LEXIS 616; 62 T.C.M. (CCH) 1249; T.C.M. (RIA) 91568; November 25, 1991, Filed *616 Decisions will be entered under Rule 155. Raymond P. Wexler, Todd F. Maynes, and William R. Welke, for the petitioner. James S. Stanis, Judith M. Picken, and William G. Merkle, for the respondent. GOFFE, Judge. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in petitioner's Federal income tax as follows: Taxable
Year
Deficiency
1980
$ 4,732,815
1981
$ 4,520,696
Due to concessions by both parties, the only remaining issue in this case is whether interest income earned by petitioner should be deemed patronage-sourced income within the meaning of subchapter T of the Internal Revenue Code. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations, supplemental stipulations, and attached exhibits *617 are incorporated herein by this reference. Petitioner corporation, CF Industries, Inc. and subsidiaries (hereinafter petitioner or CF), had its principal place of business in Long Grove, Illinois, at the time it filed its petition. CF is the parent corporation of three operating subsidiaries, CF Chemicals, Inc. (manufacturer of finished phosphate fertilizers), CF Mining Corp. (phosphate rock mining and processing), and Central Phosphates, Inc. (manufacturer of finished phosphate fertilizers). The parent and the subsidiaries operate on a nonexempt cooperative basis within the meaning of section 1381(a)(2) of subchapter T. Ownership of CF is made up of 18 shareholder patrons, all of whom are regional farmers cooperatives. Of these shareholder patrons, 16 are located in the United States and also operate under subchapter T while the remaining two shareholder patrons are located in Canada and operate as cooperatives under Canadian law. Each shareholder patron owns one share of CF's common stock and the board of directors is composed of one representative from each of the shareholder patrons. Petitioner's primary business is the manufacture and distribution of chemical fertilizers, *618 specifically nitrogen, phosphate, and potash. During the years in issue, CF held approximately 20 percent of the domestic nitrogen and phosphate fertilizer markets and approximately 16 percent of the domestic potash market. CF also engages in mining and sales activities which pertain to its fertilizer business. CF also received income during 1980 and 1981 from an oil and gas venture, management fees for managing fertilizer plants, and proceeds from sales of fertilizer byproducts. During the years in issue, CF operated an extensive distribution system involving regional liquid terminals and dry product warehouses, an ocean-going tub/barge unit, and an extensive rail car fleet. In addition, CF was a shareholder patron in a cooperative barge company named Agri-trans which supplies distribution services. CF sells fertilizer to its shareholder patrons on a patronage basis; that is, the net earnings received by CF from business done with its shareholder patrons are repaid to them once each year in the form of patronage dividends. The amount of the patronage dividend received by each shareholder patron each year is not dependent upon a percentage ownership of CF's stock. Rather, *619 patronage dividends are allocated and paid according to the amount of business done by each shareholder patron with CF during the year and on the profitability of the products purchased by that shareholder patron. Each shareholder patron, in turn, resells and distributes the fertilizer products to local cooperatives or directly to farmers. After CF has met the needs of its shareholder patrons for its products, it sells to nonshareholders. CF does not, however, sell its products to nonshareholders on a patronage basis (nonshareholder patrons do not receive patronage dividends). CF's shareholder patrons have first priority for its products. Nitrogen fertilizers, consisting primarily of anhydrous ammonia, urea, and UAN solutions, represent approximately 40 to 45 percent of CF's sales. Phosphate fertilizers, primarily diammonium phosphate, represent 35 to 45 percent of CF's sales. Potash fertilizers represent approximately 10 to 20 percent of CF sales. In 1980, 87.8 percent of CF's product sales were made to shareholder patrons and 12.2 percent were made to nonshareholders. In 1981, 95.8 percent of CF's sales were to its shareholder patrons while 4.2 percent of its sales were *620 made to nonshareholders. CF's practice in 1980 and 1981 was to pay its patronage dividends, if any, to its shareholder patrons in the form of one-half in cash and one-half in "qualified written notices of allocation." These qualified written notices of allocation take the form of preferred stock. CF paid $ 157,757,957 in patronage dividends in 1980 and, in 1981, it paid $ 39,488,271. CF deducted these amounts as patronage dividends on its consolidated income tax returns for 1980 and 1981. The fertilizer industry is highly volatile due to many changes in supply, demand, and price that are affected by seasonal factors, cyclical factors, political factors, and the weather. Demand for fertilizer products is derived from demand for agricultural products. Weather conditions (excessive moisture, frozen ground, etc.) can shorten the time period that a farmer has to conduct pre-plant field work, thereby reducing demand for fertilizer. Federal programs in which farmers are subsidized in exchange for agreements to idle certain portions of acreage also affect fertilizer demand. In addition, fertilizer products are fungible commodities that are produced, consumed, and traded on a worldwide *621 basis. The market is highly sensitive to changes in both the U.S. and world economies. The fertilizer industry is also seasonal. The primary planting seasons are in the spring and fall; fertilizer sales peak during those seasons. CF, therefore, builds up its inventories in the summer and winter months in anticipation of the spring and fall planting seasons. CF's cost of purchasing raw materials does not necessarily move in tandem with fertilizer prices. Raw material costs often rise or fall with fertilizer prices moving in the opposite direction. This is illustrated by the difference between CF's accounts receivable and the accounts payable on a monthly basis for the taxable years in issue: (000's Omitted) 1980
1981
Accounts
Accounts
Accounts
Accounts
Receivable
Payable
Receivable
Payable
Jan
$ 95,786
$ 85,746
$ 98,166
$ 86,428
Feb
84,064
86,869
69,101
95,735
Mar
56,429
84,754
99,897
105,658
Apr
158,707
101,412
128,526
108,763
May
73,943
73,300
92,293
98,774
Jun
105,627
123,122
105,015
110,427
Jul
98,968
134,881
120,603
132,767
Aug
96,054
139,845
107,537
121,522
Sep
81,005
93,650
48,786
85,803
Oct
108,440
85,974
70,770
86,381
Nov
127,315
107,643
68,590
93,583
Dec
125,615
118,300
75,827
99,590
*622 CF dedicates a substantial amount of time, effort, and money to preparing an annual budget, which consists of twelve monthly budgets. Due to the volatility of the fertilizer market, however, such budgets are not completely reliable. For example, in 1979, CF budgeted a loss of more than $ 13 million, but then earned more than $ 136 million. For 1980, CF budgeted $ 201 million as expected net earnings, but actually earned $ 215 million. In 1981, CF budgeted $ 170 million as expected earnings but the actual earnings were only $ 65 million. CF grew rapidly in sales volume, total assets, and equity from 1970 to 1980. In 1979 and 1980, CF's management decided that, as a result of CF's expansion in the 1970's, CF was too highly leveraged, that is, its ratio of long-term debt to total capital employed was too high. The debt ratio on December 31, 1978, was 68 percent. CF's management goal was to strengthen its balance sheet in order to withstand volatile business cycles and satisfy outstanding loan agreements. In order to do this, CF would have to reduce the ratio of long-term debt to equity. Accordingly, in June 1980, CF devised its Capital Structure Policy Plan that, among other *623 things, resolved to reduce the debt ratio so that long-term debt would be no more than 50 percent of total capital. The method of achieving a reduced debt ratio included restricting the payment of cash for patronage dividends owed to shareholder patrons, replacing asset-based financing with unsecured financing, and increasing flexibility on the terms of its long-term capital funds. In 1980 and 1981, CF entered into agreements with its shareholder patrons called Member Product Purchase Agreements which set forth a volume range of fertilizer that CF was to sell to them. These agreements provided a measure of stability to CF's sales volume on a tonnage basis, because it created, in essence, "preferred customers" to which CF could reasonably assume that large amounts of fertilizer would be sold. Because these membership agreements were in place, CF decided that it could bear a higher debt ratio than other fertilizer companies similarly situated. The Member Product Purchase Agreements did not, however, require the shareholder patrons to buy exclusively from CF. The agreements allowed shareholder patrons to purchase products from other sources if those sources made products available *624 at more favorable prices or more favorable credit terms. The agreements also permitted shareholder patrons to honor current outstanding purchase agreements with other suppliers or to purchase products from facilities which the shareholder patron owned directly or indirectly. A properly managed business with fluctuating capital must have procedures for administering operating cash. Because the fertilizer industry is so volatile, it is essential that operating cash be retained in a safe and readily available form. To meet its immediate needs, it is appropriate for a business to place its operating cash in safe, liquid, money-market instruments. Financial prudence requires that the business attempt, to the best of its ability, to stagger the maturities of its money-market instruments so that favorable terms can be obtained on cash which would otherwise be idle. The short-term placement, however, must not compromise safety and liquidity. The primary reason CF must stagger the maturity dates of these instruments is to ensure that accounts payable to CF's suppliers are satisfied when they become due. CF's major suppliers and the credit terms under which CF was required to pay these *625 suppliers were as follows: Supplier
Terms
Louisiana Interstate Gas
Net cash 10 days from date
Corporation (natural gas)
of invoice (billed monthly)
Texaco (natural gas)
Net cash 10 days from date of
invoice (billed monthly)
Duval (sulfur)
Tenth of the month following
the shipping month (billed
every 2 to 3 days)
Exxon (sulfur)
Net cash 30 days from date of
invoice (billed weekly)
IMC (wet rock)
Net cash 30 days from date of
invoice (billed weekly)
Central Canada Potash
Net cash 30 days from date
(potash)
of invoice (billed every few
days)
Potash Corporation of
Net cash 30 days from date of
Saskatchewan (potash)
invoice (billed every few
days)
National Potash Company
Net cash 30 days from date of
(potash)
invoice (billed every few
days)
CF employs a full-time cash manager, Eric Bergstrom, to manage cash flow. Mr. Bergstrom, in consultation with other management personnel at CF, continuously monitors and evaluates CF's cash needs, and when the company has more cash than is required to meet that day's business needs, he purchases short-term, liquid money-market instruments with that excess cash. When CF does not have sufficient cash to meet that day's business *626 needs, Mr. Bergstrom arranges short-term borrowing. In making his determination of CF's operating needs, Mr. Bergstrom does not rely upon budgets prepared by management because they cannot adequately determine sales prices and sales volumes. Mr. Bergstrom can estimate, with reasonable accuracy, CF's cash inflows and outflows for about 1 month (approximately a 30-day period). An evaluation of Mr. Bergstrom's job performance is based upon whether CF has adequate cash to meet its business needs, not upon the rate of return he earns for CF on its temporarily surplus cash. His primary job responsibility remains the same whether CF has or does not have adequate cash on hand to meet the company's business needs. In any case, Mr. Bergstrom's chief duty is to make certain that CF has cash available when needed and he is instructed to minimize short-term borrowing so that CF does not incur unnecessary interest costs. When CF has excess cash, it first uses that cash to meet its business needs on that day. If additional cash is available after meeting these needs, CF repays any short-term indebtedness if such repayment is permitted by the terms of the debt agreement. Such repayment of *627 short-term debt takes priority over placement of funds in money-market accounts. If CF still has surplus cash, it then purchases short-term, liquid, money-market instruments. CF's short-term investment policy prohibits speculative investment, such as stocks or bonds, with excess cash. CF does not borrow money in order to purchase short-term money-market instruments. It only incurs short-term indebtedness when it does not have adequate cash resources to meet its business needs for that day. In April 1980, Mr. Bergstrom mistakenly forecast CF's cash needs and was forced to borrow a total of $ 36 million, incurring interest expense. This short-term borrowing and the paydown of the outstanding balance took place on a daily basis and continued into May 1980, reaching a high in that month of $ 37 million. On October 22, 1981, Mr. Bergstrom again erroneously forecast CF's cash needs and had to borrow $ 20 million, again incurring interest expense. A repayment of $ 2,500,000 on November 23, 1981, reduced CF's short-term indebtedness to $ 17,500,000 until December 23, 1981, at which time further borrowing brought CF's short-term debt obligation to $ 26 million. Throughout 1980 and *628 1981, the balances of money-market accounts, borrowing, and paydowns of debt fluctuated daily. In order to accommodate the financial aspects of its operation, CF maintained a "concentration banking account" system with Continental Illinois National Bank (Continental Illinois) in Chicago, Illinois, for the various members of the consolidated group. The concentration account system was composed of a primary concentration account at Continental Illinois and numerous subaccounts at Continental Illinois and other banks. In addition, CF had numerous lockbox accounts at banks near the offices of CF's shareholder patrons. Cash received from CF's operations was deposited into the concentration account, the lockbox accounts, or the subaccounts. Funds were generally disbursed from the subaccounts. Each of the subsidiaries of CF's cooperative group maintained one or more bank accounts in which there were some small balances. Other subaccounts were maintained as "zero balance" accounts. That is, balances in these accounts at the end of the day were transferred into the concentration account. When funds were required for payment, the amount was transferred from the primary concentration *629 account to the appropriate sub-account. The overall purpose of CF's concentration account system was to marshall as much of CF's cash resources as possible into one account. CF could then manage all of its cash efficiently and purchase money-market instruments when cash was not needed to cover checks that had already been written or to meet compensating balance requirements. Apart from the cash management just described, CF did not further divide its cash into categories. All of its cash was treated equally and it was not put into additional or different accounts or categories. Nor was CF's cash assigned labels for such items as operations, long-term investments, or other uses. CF earned $ 6,552,362 in interest income in 1980 from placing temporarily surplus cash in 352 short-term money-market instruments. The source of this interest income is as follows: Type of instrument
Interest earned
Government securities
$   201,267
(includes repurchase agreements)
Certificates of deposit
$ 4,752,215
(includes repurchase agreements)
Commercial paper
$ 1,598,880
(includes repurchase agreements)
Of the 352 money-market instruments into which CF put its surplus cash in 1980, *630 263 instruments (75 percent) had a maturity of 7 days or less; 53 instruments (15 percent) had maturities ranging from 8 to 29 days; and 35 instruments (10 percent), including floating-rate notes, had maturities of 30 days or more. CF's sources of cash (as adjusted to cash basis) in 1980, as derived from CF's consolidated statements, were as follows: Percent
Item
Amount Recd.
of Total Receipts
Fertilizer Sales
$ 1,193,175,000
98.65%
Interest Income at Issue
6,552,362
0.54 Interest Income not at Issue
975,638
0.08 Notes Receivable
6,192,000
0.51 Stock in Supplier Sold
794,000
0.07 Stock Issued
1,800,000
0.15 TOTAL CASH RECEIPTS
$ 1,209,489,000
100.00%
A total of $ 4,385,758 reflects interest income from short-term cash placement in money-market accounts ranging in maturity from 1 to 30 days. CF earned $ 11,528,857 of interest income in 1981 from placing temporarily surplus cash in 310 short-term money-market instruments. The source of this interest income is as follows: Type of instrument
Interest earned
Government securities
$      6,565
(includes repurchase agreements)
Certificates of deposit
$ 10,030,965
(includes repurchase agreements)
Commercial paper
$  1,491,327
(includes repurchase agreements)
*631 Of the 310 money market instruments into which CF put its surplus cash in 1981, 228 instruments (74 percent) had a maturity of 7 days or less; 40 instruments (13 percent) had maturities ranging from 8 to 29 days; and 42 instruments (14 percent), including floating-rate notes, had maturities of 30 days or more. CF's sources of cash (as adjusted to cash basis) in 1981, as derived from CF's consolidated statements, were as follows: Percent
Item
Amount Recd.
of Total Receipts
Fertilizer Sales
$ 1,106,728,000
96.49%
Interest Income at Issue
11,528,857
1.01
Interest Income not at Issue
1,901,143
0.16
Short-term Borrowing
22,736,000
1.98
Stock in Supplier Sold
2,882,000 0.25
Stock Issued
1,300,000
0.11
TOTAL CASH RECEIPTS
$ 1,147,076,000
100.00
A total of $ 4,125,946 reflects interest income from short-term cash placement in money-market accounts ranging in maturity from 1 to 30 days. CF attempted to stagger the maturities of its money-market instruments so that the instruments would mature at, or near, the time the cash might be needed in CF's business. CF placed surplus cash in instruments with maturities longer than 1 month only when it had *632 sufficient cash placed in instruments of shorter duration that could meet foreseeable business needs within that 1-month period. In 1980, CF prepared a "Short-Term Investment Policy" to formalize its procedures for control and management of its surplus cash. Pursuant to the policy, Mr. Bergstrom was required to place surplus cash in short-term instruments according to the following criteria, ranked in decreasing order of importance: 1. Safety of principal 2. Liquidity 3. Maturity date (having funds available when needed) 4. Maximum dollar limitations per issuer 5. Rate of return Safety of principal is CF's highest priority for managing surplus cash because CF's officers and directors have determined that the company cannot afford to risk the safety of this immediate source of cash, given the inherent volatility of the fertilizer market. Liquidity is the second priority because the funds must be available immediately when circumstances require cash. Cash equivalent/money-market type instruments can, thus, be timed to mature at virtually any time. In 1980 and 1981, the U.S. economy experienced what economists call an "inverse interest-rate structure." During this time, *633 short-term rates were at historic highs partly because investors were not sure if the interest rates would go any higher, so they did not want to lock in to an investment for a long period of time. Prudent investors preferred short-term investment vehicles because if the interest rate went up, then their investment could quickly be placed into another instrument generating the higher interest rate. Although the inverse interest-rate phenomenon was particularly beneficial for CF in managing its cash for short-term periods, the rate of return on the surplus cash was nevertheless the lowest of all CF's priorities. Mr. Bergstrom followed the Short-Term Investment Policy in placing CF's surplus cash in short-term money-market instruments during 1980 and 1981. By a specific directive in the Policy, Mr. Bergstrom was instructed to place surplus cash in instruments of 1 month or less, unless all of CF's foreseeable business needs could be met without such cash in the next month. This is because when instrument maturities are staggered, the risk of illiquidity is reduced to a minimum. Short-term maturities on money-market instruments are also necessary due to the volatile and cyclical *634 nature of the fertilizer industry. Petitioner filed consolidated returns for 1980 and 1981, deducting interest income generated from money-market instruments as patronage-sourced. The Commissioner disallowed the deduction determining that it was not patronage-sourced. ULTIMATE FINDING OF FACT The interest income which petitioner received from short-term money-market instruments for periods of 30 days or less was derived from business performed with or for petitioner's patrons. OPINION The issue presented is whether the interest income from short-term money-market instruments earned by petitioner was derived from "business done with or for [its] patrons" within the meaning of section 1388(a)(1). If the interest income is patronage-sourced, [2] then it is taxed only once, usually to the patron. If it is not patronage-sourced, then the income is fully taxable to the cooperative and, if paid out in dividends to the patrons, it is taxed as income to the patrons as well. Sec. 1382(b); Illinois Grain Corp. v. Commissioner, 87 T.C. 435, 450 n.3 (1986). *635 Section 1388, in pertinent part, provides: SEC. 1388(a). PATRONAGE DIVIDEND. -- For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies -- (1) on the basis of quantity or value of business done with or for such patron, (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons. Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions. The regulations defining income "from sources other than patronage" provide: (2) Definition. As used in this paragraph, the term "income derived from sources other than patronage" means incidental income derived from sources not directly *636 related to the marketing, purchasing, or service activities of the cooperative association. For example, income derived from the lease of premises, from investment in securities, or from the sale or exchange of capital assets, constitutes income derived from sources other than patronage. [Sec. 1.1382-3(c)(2), Income Tax Regs.] It is well established that interest income generated by a cooperative may have the quality of income from patronage sources, depending upon the circumstances. St. Louis Bank for Cooperatives v. United States, 224 Ct. Cl. 289, 624 F.2d 1041 (1980); Illinois Grain Corp. v. Commissioner, 87 T.C. 435, 451 (1986), citing Cotter and Co. v. United States, 765 F.2d 1102 (Fed. Cir. 1985). Short-term interest income is patronage-sourced if it is: so closely intertwined and inseparable from the main cooperative effort that it may be properly characterized as directly related to, and inseparable from, the cooperative's principal business activity, and thus can be found to "actually facilitate" the accomplishment of the cooperative's business purpose. * * * [Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, 88 T.C. 238, 243 (1987), *637 quoting Illinois Grain Corp. v. Commissioner, supra at 459.] On the other hand, short-term interest income is not patronage-sourced if it is derived from sources that: have no integral and necessary linkage to the cooperative enterprise, so that it may fairly be said that the income from such activities does nothing more than add to the taxpayer's overall profitability. * * * [Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, supra at 243, quoting Illinois Grain Corp. v. Commissioner, supra at 459.] As the cases make clear, applying the standard is necessarily fact-intensive. Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, supra at 244; Illinois Grain Corp. v. Commissioner, supra at 459-460. The taxpayer in Cotter and Co. was a cooperative in the business of purchasing, manufacturing, and distributing to its patron members hardware and related goods in large volume. It was important that the taxpayer have access to cash, either through short-term borrowing or cash on hand, to finance the volume purchase of goods which it later *638 resold to its patron members. During the year, the taxpayer sometimes had a working capital deficit, whereas at other times, it had surpluses of cash in excess of its immediate needs. When the taxpayer had a temporary surplus of cash, it placed the cash in short-term commercial paper. The Commissioner disallowed as patronage-sourced the interest income earned by the taxpayer from the short-term placement of its funds on the grounds that such actions were merely a passive investment of surplus funds, which had no purpose except to enhance the overall profitability of the cooperative. The Claims Court agreed and held that the interest income was not patronage-sourced nor eligible for distribution as patronage dividend. Cotter and Co. v. United States, 6 Cl. Ct. 219 (1984). The Federal Circuit reversed the Claims Court and held that the taxpayer, acting as any reasonable business person, reduced the cost of obtaining money while retaining its necessary availability by keeping short-term commercial paper. "Its actions are akin to placing its funds in a bank account." Cotter and Co. v. United States, 765 F.2d at 1107. See also St. Louis Bank for Cooperatives v. United States, 224 Ct. Cl. 289, 624 F.2d 1041 (1980). *639 In Illinois Grain Corp. v. Commissioner, 87 T.C. 435 (1986), the taxpayer was a cooperative that marketed its patrons' grain. In deciding this case, we concluded that the "earned interest from cash that it placed temporarily in very short-term interest-bearing accounts (e.g., overnight, overweekend, or not-to-exceed 10-day deposits)" was patronage-sourced because it provided necessary liquidity for operation. Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, 88 T.C. at 243. We also observed that the "specific nature of * * * [the taxpayer's] business required it to have available on short notice large amounts of cash" and it was "simply prudent money management" and not "'investment' of the cash as that term would generally be understood." Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, supra at 243-244. In short, the question is whether the taxpayer's placement of temporary cash surpluses in short-term money-market accounts is integrally intertwined with the taxpayer's cooperative business of managing its money supply for its immediate needs. The distinction is drawn, *640 therefore, between "investments" and simply the prudent and correct management of the taxpayer's money which is directly related to the conduct of its cooperative business. St. Louis Bank for Cooperatives v. United States, 624 F.2d at 1053; Illinois Grain Corp. v. Commissioner, supra at 456. Respondent in the instant case initially argues that there must be some type of "direct interrelationship" or connection between the payers of interest income and the cooperatives' main activities. In several early cases, the interest income which the cooperative received was from an entity which was somehow related to the cooperative's business. See, e.g., Land O'Lakes, Inc. v. United States, 675 F.2d 988 (8th Cir. 1982) (cooperative purchased stock in bank as condition of a loan and received dividend income which was patronage-sourced because buying the stock was a condition of getting the loan); St. Louis Bank for Cooperatives v. United States, supra (interest income which the cooperative received from lending its surplus cash was patronage-sourced because it was the result of the business *641 of supplying capital to other cooperatives); Linnton Plywood Association v. United States, 410 F. Supp. 1100 (D. Ore. 1976) (dividend income from corporation in which cooperative held stock was patronage-sourced because the corporation was formed to supply glue for the cooperative's plywood business). Respondent further argues that more recent cases, e.g., Cotter and Co. v. United States, 765 F.2d 1102 (Fed. Cir. 1985) and Illinois Grain Corp. v. Commissioner, supra, have been incorrectly decided because they do not require the "direct transactional interrelationship" between the activities that produced the interest income and the cooperatives' day-to-day business. Respondent also contends that current authority in this area is flawed because pure money management activities of a cooperative are not activities directly related to or integrally intertwined with the main cooperative activity for purposes of subchapter T of the Internal Revenue Code. Respondent equates the patronage dividend to a special tax deduction for cooperatives, and because tax deductions are a matter of legislative grace, section 1388(a) must be *642 strictly construed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 78 L. Ed. 1348, 54 S. Ct. 788 (1934). For these reasons, respondent argues that we should reinterpret the law and overrule current authority. Respondent mistakenly reads section 1388 as providing a deduction to cooperatives. To the contrary, section 1388 is a definition section. It is contained under part III (Definitions; Special Rules) of subchapter T (Cooperatives and Their Patrons) in chapter 1 (Normal Taxes and Surtaxes) of subtitle A (Income Taxes). The deduction provision (or more accurately, the exclusion from gross income provision) with which respondent is concerned is contained in section 1382(b). This section is located in part I (Tax Treatment of Cooperatives) of subchapter T. A definition in the Code is not the equivalent of a deduction when it merely includes some items and excludes others, particularly when there is another section which deals with deductions or exclusions. The allowance of an exclusion from gross income of amounts which are paid out as patronage dividends has not been placed upon the ground that cooperatives are special creatures of statute under the tax laws, but is justified *643 rather upon the theory that patronage dividends are in reality rebates on purchases or deferred payments on sales . . . and thus do not constitute taxable income to the cooperative. The theory is that the cooperative is merely a conduit . . . or a trustee for the dividend, which are at all times the property of the member stockholders. The money involved never belongs to the cooperative. [Columbus Fruit & Vegetable Coop. Association, Inc. v. United States, 7 Cl. Ct. 561 (1985); citations omitted.]
We must also disagree with respondent with regard to the correct interpretation of the definition of patronage-sourced income under subchapter T. In order to operate as a cooperative, it is axiomatic that the entity survive. Prudent cash management is necessary to finance the cooperative's operations. It is a prudent cash management technique to temporarily place excess funds in short-term money-market instruments to counteract the effect of inflation and make the most of cash that would otherwise sit idle. The Federal Circuit in Cotter and Co. took judicial notice that in managing excess funds, it is expected that the proper businesslike handling of the *644 funds is to realize "the fruits available in the form of interest, and not to do so would be a dereliction of duty." Cotter and Co. v. United States, supra at 1105. In the instant case, petitioner first used available cash to meet business needs on that day. The second priority was to pay down short-term indebtedness which it incurred on several occasions during the taxable years in issue. Such payment was made even though the rate of return on short-term money-market accounts was at a historic high in U.S. economic history. After meeting these obligations, petitioner placed excess cash in nonspeculative money-market instruments. This was a proper businesslike manner in handling excess cash. Cotter and Co. v. United States, supra.
We conclude that the recent cases in this area have been correctly decided and, therefore, we will follow established precedent in this Court and others which hold that "short-term placement of excess cash [is] simply prudent money management by [a] cooperative's managers" for the treatment of patronage-sourced funds under subchapter T. Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, 88 T.C. at 243. *645 Such cash management, and the interest income resulting therefrom, is directly related and integrally intertwined with a cooperative's activity. Although we agree with petitioner that short-term interest income resulting from prudent cash management is patronage-sourced, we also agree with respondent's argument that Congress did not intend the term "with or for patrons" to be unlimited in scope. Cotter and Co. v. United States, 765 F.2d at 1110. The amount placed for a short-term period should be limited to an amount necessary to meet foreseeable needs and the amount must be reasonable in relation to the anticipated costs or expenses to be paid by the cooperative. Petitioner faced a particularly difficult challenge in determining its cash needs. It is patently obvious that petitioner is engaged in both a volatile and cyclical industry. Fertilizer is a fundamental component in the agriculture industry. Demand for fertilizer, and hence its price, is directly affected by farming and other agricultural demands. It is well established that supply, demand, and price in the agricultural area are affected by many things, including seasonal, cyclical, and political *646 factors, and the weather. Illinois Grain Corp. v. Commissioner, 87 T.C. at 441. We believe the credible and uncontroverted testimony of Richard J. Brown, senior vice president in charge of the Special Industries Group at the Harris Trust and Savings Bank in Chicago. The Special Industries Group includes the bank's Agribusiness Division which works with several companies in the agriculture/fertilizer industry, including CF. Mr. Brown has a B.B.A. and an M.B.A. from the University of Notre Dame and has been with the Harris Trust and Savings Bank since 1970. As a result of Mr. Brown's direct experience in this industry and his review of CF's financial data, he has concluded that supply and demand for fertilizer products constantly fluctuate. Both prices and the cost of production are susceptible to sizable short-term swings. Respondent advances several arguments to support the theory that, despite the established volatility in the fertilizer industry, petitioner actually enjoyed some level of price certainty. Therefore, respondent argues, keeping cash in short-term money-market accounts was unnecessary. Respondent bolsters this contention by observing that *647 petitioner did not need such a large amount of funds on hand in the decade prior to 1980, so it probably did not need to have such an amount available in 1980 and 1981. Respondent contends that petitioner had access to considerable amounts of short-term credit in the event it needed funds in times of low cash flow and further, that such borrowing is a prudent, commonly used business practice. Respondent also argues that short-term interest rates, particularly those paid on certificates of deposit and commercial paper, reached historic peaks in 1980 and 1981, so it would have been wise to "invest" short-term rather than long-term during this particular time in economic history. CF experienced rapid growth prior to the tax years at issue and, as a result, was highly leveraged. In 1979, CF's management decided to reduce the level of debt and manage its cash in a way that would help it withstand business cycles. As a result of this policy, CF changed certain types of financing and, during 1980 and 1981, CF's business was at record levels. We think it is entirely reasonable and prudent, given these facts, that CF kept a higher level of operating cash during this period in its history. *648 This Court should not substitute its business judgment for a reasonable, well-founded judgment of CF's management. Hillsboro National Bank v. Commissioner, 460 U.S. 370, 385, 75 L. Ed. 2d 130, 103 S. Ct. 1134 (1983); Citron v. Commissioner97 T.C. 200 (1991); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 345 (1991); Seminole Flavor Co. v. Commissioner, 4 T.C. 1215, 1235 (1945). Further, we think the fact that interest rates were higher for short-term investments does not automatically convert "cash management" into "'investment' of the cash as that term would generally be understood." Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, 88 T.C. at 243-244. In order for petitioner to have cash available for immediate use, it had to place the funds in temporary short-term instruments. Short-term placement of excess cash is a key aspect of liquidity and a fundamental component of cash management. Petitioner must properly manage its excess capital in every year of its existence regardless of whether the short-term rate of return exceeds the long-term interest rates or vice-versa. The interest *649 rate anomaly resulting in an "inverse rate structure" happened to work in petitioner's financial favor during this period of U.S. economic history. Mr. Brown, from the Harris Trust and Savings Bank, testified: It would be totally inappropriate for a company to let its operating cash sit idle. Such an action would reflect poorly on the management of the company, and adversely affect any bank's perception of a company's performance and reliability. A failure by CF to properly manage its operating cash and place such cash in money market instruments would severely damage CF's reputations in the banking community, and in fact would be unthinkable.
Mr. Bergstrom, CF's cash manager, followed the company's Short-Term Investment Policy which listed the rate of return as the lowest item of importance when placing its excess cash for a short-term period. The potential rate of return had little or nothing to do with the day-to-day cash management of petitioner's finances. Mr. Bergstrom's uncontroverted testimony established that he staggered the short-term money-market accounts to mature when the cash was expected to be needed to pay CF's obligations as they came due. Respondent *650 also argues that the Member Product Purchase Agreements provided CF with an increased level of stability in the operation of its business, therefore permitting it to operate with less cash on hand than it had. This theory is misleading, however, because it overlooks the fact that CF could not insulate itself from price fluctuations for its supply of natural gas, sulfur, wet rock, and potash. At best, the price agreements ensure some certainty of receivables for CF, but they do not protect CF from price changes of raw materials. We also cannot overlook the fact that these agreements merely provided CF with "preferred customers" and did not require that shareholder patrons purchase products from CF when alternative sources of supply were available with more favorable prices or credit terms. Respondent's contention that petitioner need not place excess cash in money-market accounts because it had short-term lines of credit available is also misplaced. While such borrowing is an accepted business practice (and one that petitioner did, in fact, use in both tax years in issue and thereby did incur interest expense), it is not as financially prudent as timing money-market instruments *651 to mature when cash is needed. CF carefully attempted to stagger the maturity dates of these instruments to meet foreseeable obligations. Respondent's suggested method of resorting to short-term borrowing during petitioner's operating cycle would result in the mismanagement of its excess cash. It is altogether reasonable, if CF is to operate as a successful cooperative, that it should guard against price swings by keeping sufficient cash on hand to pay for its supplies. While that cash is on hand, it is prudent to manage the cash in a manner which negates the effect of inflation. Cotter and Co. v. United States, 765 F.2d at 1105. We therefore reject the argument that petitioner should have relied upon borrowing to meet all or most of its short-term operating needs. Respondent argues that we should not follow the established precedent in this area because there is no objective standard by which to measure the "integrally intertwined" test set out in the cases; rather, respondent contends that petitioner advances an easier "reasonably needed" test to measure whether the interest on short-term money-market funds was to be used in its principal business *652 activity. Respondent also argues that, if we find in petitioner's favor, we effectively create two classes of cooperatives depending upon their operating environments: cooperatives in volatile industries and those in nonvolatile industries. Both these concerns fail to appreciate the fact-intense nature of the standard which we must apply. Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, 88 T.C. 238, 244 (1987); Illinois Grain Corp. v. Commissioner, 87 T.C. 435, 459-460 (1986). Hence, there cannot be an "objective" rule applicable in all situations to all taxpayers. Volatility (or lack thereof) will always be a pertinent fact to consider in examining whether excess funds should be placed in short-term money-market instruments and, if appropriate, the amount of interest generated by the placement of these funds. Volatility will not, however, be the only fact which must be considered. Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, supra at 245 n.14 (some interest income held to be patronage-sourced while the remainder held not to be immediately required for taxpayer's business *653 because of failure to make the extensive showing of specific foreseeable need for the cash). Respondent alternatively argues that, should we decide to follow Cotter and Co. v. United States, supra, and Illinois Grain Corp. v. Commissioner, supra, then we should only permit interest generated on money-market instruments with maturities of 30 days or less to be characterized as patronage-sourced income. At trial, respondent presented the expert testimony of Allen R. Drebin, a professor of accounting and information systems at the Kellogg Graduate School of Business. Dr. Drebin holds a B.B.A., an M.B.A., and a Ph.D. from the University of Michigan and is a Certified Public Accountant licensed in Illinois. Dr. Drebin's testimony and report set forth two approaches to determine interest income directly related to principal business activity. The first technique is to construct the "operating cash needs" of CF and the second method is to fashion its operating cycle. Dr. Drebin's operating-cash-needs method consists of dividing up CF's cash into categories, e.g., operations, investment, and financing, to demonstrate sources and uses of funds in its business. *654 The operations category is apparently the category into which funds designed to facilitate principal business activity would be placed. This categorizing of cash, the definitions used, and the assumptions made in this aspect of Dr. Drebin's report accord with methods used in generally accepted accounting principles to organize and analyze financial statements. It does not, however, comport with CF's treatment of its excess cash. Respondent concedes that Dr. Drebin prepared his report based on hindsight and that he did not have CF's actual budget forecasts. For this reason, we must discount somewhat the value of Dr. Drebin's report. We also reject the operating-cash-needs theory in that report because, generally, Dr. Drebin does not appear to understand the business operation of a cooperative and, specifically, CF does not treat cash according to Dr. Drebin's assumptions. It is undisputed that CF does not pigeonhole its cash into categories as constructed in Dr. Drebin's report. CF treats all of its cash equally without depositing the cash into special accounts designated for such items as operations, long-term investments, or other uses. It marshals cash into a main account, *655 using a "concentration banking" system, but has no other grouping for the treatment of funds. Dr. Drebin uses the accounting definition of "operations" in his operating-cash-needs method, but excludes CF's patronage dividends from that term. At trial, Dr. Drebin concluded that patronage dividends are not directly related to CF's operations. Dr. Drebin stated that patronage dividends are "payments to the owner patrons. And based on their purchases, it's in a way a rebate of some of their purchases and it's a return of some of their investment. They have an investment in the company." When pressed by petitioner's counsel to explain how the dividend is calculated, Dr. Drebin admitted he could not calculate how a shareholder's share is determined: "I'm not an expert on patronage dividends." Dr. Drebin was asked how price rebates on products would be treated under his definition and he responded "Possibly as operations." In reality, patronage dividends are the functional equivalent of price rebates. This testimony highlights Dr. Drebin's unfamiliarity with cooperative business operations. A "price rebate" or dividend is given to CF's shareholder patrons on an annual basis according *656 to the amount of business done by each shareholder with CF during the year and on the profitability of the products purchased by that shareholder patron. Such dividends are not dependent upon the ownership percentage of CF stock. We accordingly disregard Dr. Drebin's attempt to force CF's financial operations to conform to a generic structure of accounting principles. The fact that CF does not operate by using certain methods or theories does not make CF's financial operation incorrect. Absent some compelling reason, it would be improper to substitute our judgment in this situation for the business judgment of CF's management who are more familiar with the operating environment and corresponding needs of their cooperative. Hillsboro National Bank v. Commissioner, 460 U.S. 370, 385, 75 L. Ed. 2d 130, 103 S. Ct. 1134 (1983); Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 269 (1986); Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 329 (1968). In the second portion of Dr. Drebin's report, he attempts to determine whether the interest income CF received from its short-term investments is directly needed in its principal business activity by using *657 an operating cycle model. We agree with Dr. Drebin's conclusion, but not for the reasons he states. Dr. Drebin noted that receivables are usually collected within 25 days in the fertilizer industry and payables are usually due to be paid by the 10th day of the following month, which generally means 40 days after purchase. With this information, Dr. Drebin devised this operating cycle: Assume the date of sale is regarded as time 0. With an average inventory holding period of 45 days, purchases would be made at time -45. With payables due in 40 days, purchases would be paid for at time -5. With a collection period of 25 days, CF would receive cash from the sale at time +25. Thus, the company would need cash for the period from time -5 to time +25, or a total of 30 days.
Petitioner argues that this model is highly artificial and it ignores key data thereby substantially understating CF's actual operating cycle. Petitioner asserts that the correct inventory turnover rate in this formula should be 53 days for 1980 and 78 days for 1981, not 45 days as determined by Dr. Drebin. Therefore, petitioner argues that the 1980-81 mathematical average was 66 days. While petitioner *658 may be correct from a purely mathematical standpoint, we are not trying to formulate some "perfect model" for CF's operating cycle. The interest income in question will be considered patronage-sourced if it was earned on short-term instruments into which excess cash was placed to meet immediate and foreseeable operating needs. We should not use hindsight to determine CF's operating needs; rather, we must work with the data which CF possessed at the time it made cash management decisions. The person charged with the responsibility of attending to the day-to-day cash needs of CF was Mr. Bergstrom, CF's cash manager. Interestingly, Dr. Drebin's operating cycle model corresponds with the undisputed testimony of Mr. Bergstrom when asked by petitioner's counsel: Q. How far out into the future can you estimate with reasonable accuracy, C.F.'s cash inflows and cash outflows? A. Approximately one month. Q. In your experience, if you are attempting to estimate cash flow in the second month into the future or into the third month into the future, how accurate can you be? A. Based on any estimated month in the current operating year, we could easily vary $ 30 million to $ 40 million *659 in either direction. Based upon this information and our careful review of the record, we hereby find that a 30-day period for estimating the cash needs of this taxpayer is appropriate. Placing excess funds which would otherwise be idle into short-term instruments, and generating interest income is "simply prudent money management by the cooperative's managers" and integrally related to the financial health of the cooperative. Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, 88 T.C. at 243. Capital invested beyond this 30-day period in which CF could foresee its obligations was not to meet its immediate needs and simply resulted in an increase of overall profitability. Certified Grocers of California, Ltd., and Subsidiaries v. Commissioner, supra;Illinois Grain Corp. v. Commissioner, 87 T.C. at 459. Accordingly, petitioners' investment of funds in instruments which exceed a 30-day period cannot be characterized as patronage-sourced. The interest income generated from funds invested over 30 days cannot be deducted from income as patronage dividends within the meaning of section 1388. Although the *660 interest income generated on instruments with maturities of 30 days or less seems very large in isolation, $ 4,385,758 and $ 4,125,946 for the 1980 and 1981 tax years, respectively, we find it within reason when examined in the context of petitioner's total receipts. Petitioner also needed this cash on hand because of the difficulty in determining anticipated receivables and payables each month. The amount of interest generated on short-term (1- to 30-day money-market instruments) is less than half of 1 percent of petitioner's total receipts for each tax year in issue. This does not indicate to us that petitioner's short-term placement of excess cash took on independent "investment" significance. Illinois Grain Corp. v. Commissioner, 87 T.C. at 456. Further, an actual examination of the monthly differences between petitioner's accounts receivable and accounts payable reveal the raison d'etre for keeping a relatively high amount of operating cash on hand for the 30-day operating cycle. In some months, such as May 1980, petitioner came close to the break-even point, taking in $ 73,943,000 with corresponding accounts payable at $ 73,300,000. The following month, *661 June 1980, petitioner received $ 105,627,000 but had accounts payable totaling $ 123,122,000, a difference of $ 17,495,000. In some months, such as February and September of 1981, petitioner's difference in its receivables and payables was $ 26,634,000 and $ 37,017,000, respectively, requiring payments of almost 50 percent more than the amount received for that month. It follows, then, that a prudent business manager, in order to meet the needs of this volatile industry, would keep an adequate amount of funds available with an appropriate cushion for price fluctuations. Petitioner did just that. In fact, respondent emphasized at trial and on brief that there is no question that CF acted reasonably in managing its short-term cash. Respondent's primary argument, which we reject, is that any amount of interest generated from the short-term placement of funds merely enhances a taxpayer's capital structure, thereby rendering it nonpatronage income. We conclude, based upon the foregoing, that interest income resulting from cash management during the 30-day period in which this petitioner attempted to meet its foreseeable obligations is patronage-sourced. CF has satisfactorily *662 established that the amount of interest generated from money-market instruments having maturities between 1 to 30 days resulted from cash management of its excess funds. This activity was integrally intertwined with CF's cooperative "business done with or for [CF's] patrons." Sec. 1388(a); St. Louis Bank for Cooperatives v. United States, 624 F.2d at 1053; Illinois Grain Corp. v. Commissioner, 87 T.C. at 456. Due to concessions and to reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable years 1980 and 1981, and Rule numbers refer to the Tax Court Rules of Practice and Procedure.↩
2. The term "patronage-sourced" does not appear in the Code. The term is used by practitioners and in this opinion to characterize income that is derived from business done with or for patrons of the cooperative. See sec. 1388(j)(4), as added by Pub. L. 99-272, 100 Stat. 82 (1986).↩